# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DISTRICT OF COLUMBIA, DELAWARE, FLORIDA, GEORGIA, HAWAII, IOWA, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NORTH CAROLINA, NEW JERSEY, NEW MEXICO, NEVADA, NEW YORK, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, *ex rel.* PETER P. LAWTON, | **CASE NO. 12–cv–10797 (MLW)** |

Plaintiffs,

vs.

TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A. INC. (f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA INC.), TAKEDA PHARMACEUTICALS INTERNATIONAL INC., TAKEDA GLOBAL RESEARCH & DEVELOPMENT CENTER INC., TAKEDA CALIFORNIA INC. and ELI LILLY AND COMPANY,

Defendants.

**SECOND AMENDED COMPLAINT UNDER THE
FEDERAL AND STATE FALSE CLAIMS ACTS**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................1

II. JURISDICTION AND VENUE ..............................................................................8

III. PARTIES ...............................................................................................................9

IV. APPLICABLE STATUTORY AND REGULATORY PROVISIONS ...........................13

    A. The False Claims Act.........................................................................13

    B. The Medicare Fraud & Abuse/Anti–Kickback Statute .......................14

    C. Off-Label Marketing ..........................................................................16

V. THE MARKET FOR ACTOS WAS ENORMOUS AND GROWING............................17

    A. The Development of Thiazolidinediones Widened the Definition of Diabetes.... 17

    B. The Potential, Expanded Prediabetes Market is Enormous .................24

    C. The ADA Supported Limited Treatment for Prediabetic Conditions in 2007...... 26

    D. Takeda Contracts Dr. DeFronzo to Conduct a Study of Actos to Contradict the ADA Consensus And Expand the Market for Actos to Prediabetes....................27

VI. TAKEDA AND LILLY ILLEGALLY PROMOTED ACTOS FOR OFF-LABEL USE.................................................................................................................28

    A. Relator Learns of Defendants' Illegal Conduct ...................................28

    B. The Takeda/Lilly Marketing Machine Off-Label Markets Actos.........................32

        a. Speakers Bureau – CME.......................................................35

        b. Publications – Ghostwriting...................................................38

        c. Core Message: Focus on Glycemic Control Through Treatment of Insulin Resistance and Beta-Cell Preservation With Actos......................43

        d. Defendants Marketed the Core Message To Doctors ................................48

        e. Dr. DeFronzo: Primary Takeda KOL While Working to Give the False Impression of Clinical Bases for Off-Label Use of Actos ..............50

        f. Dr. DeFronzo's Further Promotion of Actos for Prediabetes...................60

        g. Other KOLs on Takeda's Payroll Echoed DeFronzo's Messaging and Themselves Prescribed Actos Off-Label for the Treatment of IGT and Prediabetes...................................................................61

VII.    TAKEDA AND ITS PAID COTERIE DOWNPLAYED HEALTH RISKS AND
        USED TRUSTED DIABETES ORGANIZATIONS FOR ITS OFF-LABEL
        PROMOTION OF ACTOS ...................................................................................... 70

        A.    Takeda Downplayed Health Risks to Promote Actos ........................... 70

        B.    Recent Court Proceedings Reveal Internal Aspects of Takeda's Knowledge of
              Health Risks ........................................................................................ 77

        C.    Critics Wary of the ACT NOW Study and Dr. DeFronzo's Recommendations .. 80

        D.    Takeda Obtained Access to and Used Trusted Diabetes Organizations for its
              Off-Label Promotion of Actos .............................................................. 85

VIII.   DEFENDANTS' PROMOTION OF ACTOS CAUSED HEALTH CARE
        PROVIDERS TO PRESCRIBE ACTOS OFF-LABEL FOR IGT/PREDIABETES
        AT GREAT EXPENSE TO GOVERNMENT PROGRAMS ........................................... 88

        A.    Takeda's Annual Reports Show the Effectiveness of Actos Sales Marketing ..... 88

        B.    Defendants' Return on Investment Was Substantial ........................... 90

        C.    Much of the Cost of Off-Label Actos Scripts Was Borne by Government
              Programs ............................................................................................. 92

IX.     DEMAND FOR JURY TRIAL ..................................................................................... 96

X.      CLAIMS FOR RELIEF ............................................................................................... 97

XI.     PRAYER FOR RELIEF ............................................................................................... 119

# I. PRELIMINARY STATEMENT

1.        This is an action brought by Peter P. Lawton ("Relator") to recover damages and civil penalties on behalf of the United States of America and individual states for false and/or fraudulent claims made, used, and caused to be made, or presented, by Takeda Pharmaceutical Company, Ltd., Takeda Pharmaceuticals U.S.A., Inc. (f/k/a Takeda Pharmaceuticals North America, Inc.), Takeda Pharmaceuticals International Inc., Takeda Global Research & Development Center, Inc. and Takeda California, Inc. (collectively, "Takeda") in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), and comparable state statutes.  In addition, Relator brings a claim of conspiracy to violate the FCA and comparable state statutes against Eli Lilly and Company ("Lilly").

2.        As alleged herein, Defendants took moneys from the government through (1) an off-label marketing campaign and (2) the use of illegal kickbacks in support of that campaign. Beginning in the late 1990s and continuing through 2011, Takeda carried out an ambitious marketing campaign for its compound pioglitazone, a.k.a. "Actos," a member of the thiazolidinediones (TZD) class of drugs, in support of the company's transformation from a chemical producer to an exclusively pharmaceutical company.  From 1999 through 2006, Lilly became Takeda's partner and co-conspirator in the campaign, contributing its marketing assets and resources within the U.S. market.  During the campaign, Actos was the sole marketable drug in Takeda's pipeline and had only been approved by the Food and Drug Administration (FDA) for the treatment of insulin resistance in Type 2 diabetics and not for other uses.  Given these limitations, Takeda and Lilly pursued a hugely aggressive, multifarious and fraudulent marketing strategy to promote Actos for uses that were not approved as safe and effective by the FDA ("off-label uses").

3.     The core messaging strategy for the campaign was to design, develop and promote quasi-scientific bases for the off-label use of Actos to treat the broader conditions driving hyperglycemia – including insulin resistance and associated Beta-cell deterioration – beyond the exclusive context of diagnosed Type 2 diabetes. By promoting Actos for glycemic control generally, Takeda and Lilly drove the use of Actos amongst prescribing physicians for so-called "prediabetes," otherwise termed Impaired Glucose Tolerance (IGT).

4.     Prediabetes is defined by The American Heritage® Medical Dictionary as the "condition of having a hereditary tendency or high probability for developing diabetes mellitus, although neither symptoms nor test results confirm the presence of the disease."[1] The FDA has never approved a drug to treat this condition. In 2007, the American Diabetes Association (ADA) recommended only lifestyle changes and limited doses of metformin for a prediabetic condition. Prior to Takeda's off-label promotion of Actos, the medical community had viewed the cardiovascular and other risks associated with Actos and other drugs in the TZD class to be too great to prescribe those drugs to patients not yet displaying indications of Type 2 diabetes.

5.     Nevertheless, Takeda's 2005 marketing strategy was to "support global efforts to expand indicated use for ACTOS" by "Building the Foundation – Influencing the influencers."[2] The content of the strategy, developed no later than the year 2000 – the outset of the partnership between Takeda and Lilly – was to promote the idea that "ACTOS can preserve beta-cell

---

[1] The American Heritage® Dictionary of the English Language, http://medical-dictionary.thefreedictionary.com/prediabetes (last visited Oct. 16, 2014).

[2] Ex. P0488-00013 to Jury Trial. References herein to "Jury Trial" or "Actos Trial" refer to the exhibits and testimony from the recent trial in the United States District Court for the Western District of Louisiana before Judge Rebecca F. Doherty, *In Re: Actos (Pioglitazone) Prods. Liab. Litig.*, No. 11-md-2299 (2014).

function, the patient segments that might be started on a TZD will change and grow significantly so that earlier in the treatment cycle, a patient would be started on ACTOS earlier in the treatment cycle." In conjunction with this message Takeda and Lilly launched "a campaign to increase awareness of those patients at risk for developing Type 2 diabetes" – i.e. those with IGT – by communicating the "delineation between impaired glucose tolerance (IGT) and Type 2 diabetes" in order "to increase the number of patients seeking treatment." The academic support for the campaign was to be "[a] study on prevention of Type 2 diabetes."[3]

6.      As detailed herein *infra*, this proposed "study on prevention of Type 2 diabetes" was Takeda's brainchild – but ostensibly was "authored" by Dr. Ralph DeFronzo – as the "ACT NOW" study, in 2006. This study became influential in the treatment of diabetes and of increased sugar levels (hyperglycemia) generally. During, before and after the ACT NOW study, Dr. DeFronzo received significant amounts of money from Takeda at the same time he used inconclusive results of the study to advocate the controversial and unprecedented use of Actos for prediabetes.

7.      The core content of Dr. DeFronzo's paid advocacy, as reflected in the ACT NOW study results, was the aggressive promotion of Actos as a means of glycemic control through the pursuit of Beta-cell preservation – i.e., the very same strategic arguments developed by Takeda and Lilly in their initial Actos marketing materials in the year 2000. In numerous key speeches and presentations following on the ACT NOW study results, Dr. DeFronzo promoted the idea of Beta-cell failure as one of the "core pathophysiologic defects in Type 2 diabetes" and that the fact that "Beta-cell failure occurs much earlier and is more severe than previously thought" means, among other things, that "therapy must be started early to prevent/slow the progressive

---

[3] Ex. P6333-00010 to Jury Trial.

Beta-cell failure that already is well established in IGT" (i.e. prediabetic) subjects and that a "treatment paradigm shift is recommended" to include treatment with Actos and other TZDs.[4]

8. Similarly, in 2011, Dr. DeFronzo relied on this ACT NOW study and explicitly recommended the active ingredient in Actos to treat prediabetes without disclosing his compensation from Takeda. Appearing at the end of a significant article in *Diabetes Care* from May 2011 in which Dr. DeFronzo recommended Actos for the treatment of prediabetes is a statement that "No potential conflicts of interest relevant to this article were reported." However, Dr. DeFronzo had significant conflicts of interest.

9. The ACT NOW study – although crucial to the success of Takeda's Actos campaign – was only one among dozens of pro-Actos studies and publications that were planned and ghostwritten by Takeda's Actos publication groups, which one Takeda employee referred to as "a manuscript factory."[5] Indeed, Dr. DeFronzo put his name as "author" on yet another false and misleading medical analysis[6] purporting to prove the cardiovascular and lipid health benefits of Actos, when, in fact, the publication was merely one of the "20 to 30 abstracts" which Takeda "need[ed] to generate" (i.e., ghostwrite) to put a positive spin on the otherwise statistically insignificant cardiovascular and lipid benefit results of the 2005 "PROactive" study.[7] The submission of the results of Takeda's PROactive study was roundly rejected by both the New England Journal of Medicine and Lancet, with one peer review panel member commenting –

---

[4] Ralph A. DeFronzo, *Banting Lecture: From the Triumvirate to the Ominous Octet: A New Paradigm for the Treatment of Type 2 Diabetes Mellitus*, 58 Diabetes 773 (2009) (the "Banting Lecture").

[5] Ex. P6063-00001 to Jury Trial.

[6] *Id.*

[7] Ex. P2127-00002 to Jury Trial.

amidst a flurry of other sharp peer review criticisms – that Takeda's PROactive submission "looks like an extremely audacious attempt to massage the PROactive study data for further 'significant' results," adding that "[t]he study design of this post-hoc analysis is seriously flawed and reflects a considerable degree of bias, some of which may have commercial implications."[8]

10.　　In exchange for posing as "authors" of Takeda's ghostwritten Actos promotional materials, Dr. DeFronzo and scores of other pharmaceutical industry "key opinion leaders" (KOLs) were paid substantial kickbacks, bribes and other financial inducements, including indirect financial support for KOLs' "Educational and Research Initiatives" through the KOLs' respective institutions or offices as "researchers" – forms of compensation, which, according to Takeda, were "the Most Desired Item a Medical Liaison can Provide Thought Leaders."[9]

11.　　These studies and publications were scientifically sub-standard and falsely purported to establish Actos as a safe and effective off-label treatment for patients diagnosed with prediabetes.　They were used by Takeda and its paid KOLs as quasi-scientific ammunition for other core Actos promotional initiatives: the Takeda speakers bureau and the vast Actos sales force.　The speakers bureau was made up of KOLs who received compensation to give Actos presentations at Continuing Medical Education (CME) meetings or medical conferences.　These presentations purported to be educational in nature, but, in reality, were heavily coached promotional performances, drawing quasi-scientific support from the same false ghostwritten Actos publications for which some of these KOLs had also posed as "authors."　Individual practitioner attendees at these speakers bureau events were carefully documented in order to

---

[8] Ex. P0550-00003 to Jury Trial.

[9] Jury Trial Transcript at 2106-7, Vol. XV.

establish a database of target prescribing physicians and to "help Takeda officially calculate the proper return on investment" in the speakers themselves.[10]

12.     Takeda also established a vast specialized Actos sales force to promote the use of Actos as safe and effective for prediabetes to prescribing physicians, including physicians prescribing to patients enrolled in Medicare, Medicaid and other federal and state healthcare programs.  The sales force was carefully coached to deliver the core messages of Actos as a preventive treatment for patients with prediabetes – to show to physicians the "import of treating diabetes before it was diagnosed,"[11] that "earlier usage of actos benefits [their] diabetic pts" (patients)[12] and to downplay the serious risks of Actos – and to "not discuss bladder cancer and sell, sell, sell."[13]  The off-label promotion of Actos for prediabetes occurred even after Takeda knew that the PROactive results were inconclusive.  In July 2006, Gigi Chen, a Takeda sales representative, promoted to a group of doctors "prediagnosis of up to 15 years and the need to treat as early as possible to address core defects."[14]  Chen, and presumably other members of the Takeda sales team, promoted the core Takeda/Lilly Actos message justifying prediabetes applications for Actos and talked about PROactive and lipid benefits when the company was not allowed to.

13.     Takeda engaged in direct marketing to the public, promoting the superior safety of Actos over Avandia – a competing drug for the treatment of prediabetes – despite the absence

---

[10] Ex. P6036-00002 to Jury Trial.

[11] Ex. P7131-00003 to Jury Trial.

[12] *Id.*

[13] Jury Trial Transcript at 3660, Vol. XXIV.

[14] *Id.* at 3751-57; Ex. P7131-00004 to Jury Trial.

of supporting clinical evidence. Takeda also made large financial contributions to the ADA, the American Association of Clinical Endocrinologists (AACE) and the American College of Endocrinology (ACE) – the educational and research arm of the AACE – to gain influence over those institutions' public positions on diabetes and prediabetes treatments, as they were being promoted by Takeda's team of KOLs.

14. The FDA utilizes a review team of medical doctors, chemists, statisticians, microbiologists, pharmacologists, and other experts to evaluate whether clinical trials demonstrate safety and effectiveness for a drug's proposed use. As stated on the FDA website: "No drug is absolutely safe – all drugs have side effects. 'Safe' in this sense means that the benefits of the drug appear to outweigh the known risks."[15] Actos carries many risks, including increased risk of bladder cancer, weight gain, bone fractures, water retention, edema, heart condition and liver disease. The FDA has never evaluated these risks against any possible benefits to patients with prediabetes. Dr. Steven Nissen, chairman of cardiovascular medicine at the Cleveland Clinic, has commented that given that "[t]he F.D.A. has never approved any drug to prevent diabetes…. [t]here's a reason for skepticism, because we don't know whether these drugs are really preventing diabetes or just masking it."[16] Nonetheless, Takeda has marketed Actos for this unapproved use.

---

[15] *FDA's Drug Review Process: Continued,* U.S. Food and Drug Administration, http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ucm289601.htm#review (last visited Oct. 7, 2014).

[16] *See* Roni Caryn Rabin, *Regimens: Drug Is Seen to Limit Progression to Diabetes*, N.Y. Times (Mar. 25, 2011), http://www.nytimes.com/2011/03/29/health/research/29prevention.html (last visited Oct. 14, 2014).

15.     None of Takeda's clinical studies with Actos as a treatment for prediabetes were conducted pursuant to the standards required for FDA approval for the off-label uses that Takeda promoted.  Moreover, Takeda stood to gain – and did gain – hundreds of millions of dollars in increased market-share and profits as a result of these promotional activities.  When the patent for Actos expired and generic competitors entered the market in August of 2011, Takeda abruptly discontinued its Actos promotional campaign.  Takeda's clinical studies and aggressive promotion of Actos for prediabetes treatment, as outlined in detail herein, could only have been intended to reap the tremendous profits of the off-label uses without FDA approval – i.e., illegally.

16.     By knowingly and actively promoting Actos as safe and effective for off-label uses, Takeda caused Medicare, Medicaid and other federal and state healthcare programs to pay huge amounts for illegal false claims.  For example, as detailed herein *infra*, the Suffolk County (NY) Health Plan paid for at least 11 Actos scripts for off-label uses from 2011 through 2014.  And Suffolk County's health plan is a minute fraction of the government purchases of Actos for its public employee members.  The public sector in the United States is among the largest global purchasers of Actos.  The consequence of Defendants' illegal off-label marketing strategy has resulted in estimated damages to the government in the hundreds of millions of dollars.

17.     Takeda admitted to Relator in conversations in 2009 that it was engaging in an off-label marketing campaign.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has supplemental

jurisdiction over the counts relating to the state False Claims Acts pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

19.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside or transact, or have transacted business nationally and specifically within the District of Massachusetts.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§1391(b) and (c) because Defendants have transacted business in the District of Massachusetts.

## III.     PARTIES

21.     Relator Peter P. Lawton is a resident of Málaga, Spain.  He worked for 20 years, initially as a chemist, then as a patent agent, and later in the patent counsel's office for a major pharmaceutical company, GlaxoSmithKline plc (GSK) and its predecessors.

a.      Relator's education and experience in the pharmaceutical field is profound. He received a Higher National Certificate in Intellectual Property Law from the University of Brighton, along with a prize for best overall examination results in 1985, and graduated from the University of London with a First Class Honor Degree in Pure and Applied Chemistry in 1988. In 1991, Mr. Lawton received his Certificate in Intellectual Property Law from the University of London.  And in 1994 he became a chartered UK Patent Attorney and European Patent Attorney.

b.      Between 1983 and 2003, Mr. Lawton worked for GSK and its predecessors in various roles.

c.      From 1983 to approximately 1985 Mr. Lawton was a chemical development technician for Beecham Group P.L.C., in Worthing, West Sussex, in the United Kingdom.

d. From approximately 1985 to approximately 1988, he was a chemical development scientist for Beecham Group P.L.C., in Worthing, West Sussex, in the United Kingdom.

e. From approximately 1988 to approximately 1989, Mr. Lawton was a senior chemical development scientist for Beecham Group P.L.C., in Worthing, West Sussex, in the United Kingdom.

f. From approximately 1989 to approximately 1991, he was a patent trainee for SmithKline Beecham P.L.C., in Epson, Surrey, in the United Kingdom.

g. From approximately 1991 to approximately 1994, he was an associate patent trainee for SmithKline Beecham P.L.C., in Epson, Surrey, in the United Kingdom.

h. From approximately 1994 to approximately 1995, he was a patent agent or "attorney" for SmithKline Beecham P.L.C., in Epson, Surrey, in the United Kingdom. Although the British refer to patent agents as patent attorneys, Mr. Lawton was not a lawyer and never appeared in court.

i. From approximately 1996 to approximately 1997, he was a senior patent agent or "attorney" for SmithKline Beecham P.L.C., in Epson, Surrey, in the United Kingdom.

j. From approximately 1997 to approximately 1999, he was an associate patent counsel for SmithKline Beecham Corporation, in Philadelphia, Pennsylvania.

k. From approximately 1999 to approximately 2002, he was director of life cycle maximization for SmithKline Beecham Corporation, in Philadelphia, Pennsylvania.

l. From approximately 2002 to 2003, Mr. Lawton was vice president and head of worldwide patent litigation and coordination for SmithKline Beecham Corporation, in Philadelphia, Pennsylvania.

m.      Before and after becoming a patent agent, Mr. Lawton worked in the patent office for GSK and its predecessors.  This work often involved patent prosecution.  Mr. Lawton was also tasked with the responsibility of trying to identify patentable inventions for GSK's patent department.

n.      By the mid-1990s and thereafter, Mr. Lawton's work related to "Life Cycle Maximization," a phrase used to describe the business of extending the life of branded drugs as they came off patent.  This work involved significant marketing aspects for drugs in addition to more traditional protection of intellectual property.

o.      Once he became director of Life Cycle Maximization, Mr. Lawton made the transition from working on new patent prosecution to overseeing patent litigation and often evaluating marketing issues.

p.      Mr. Lawton worked as a liaison with outside counsel in the patent litigation surrounding various drugs because of his familiarity with patents and the underlying science of various drugs.

q.      Until a year or so before his departure from GSK, Mr. Lawton was a highly prized executive.  In 1999, Mr. Lawton received the CEO executive of the year award from the CEO of SmithKline Beecham, Jan Leschley, for his overall performance.

r.      After Mr. Lawton departed the employ of GSK, he briefly worked for Novartis as the head of litigation for Novartis' generics subsidiary, Sandoz, after which he worked for several years as a consultant.

22.     Defendant Takeda Pharmaceutical Company Limited ("Takeda Ltd.") is a Japanese corporation having a principal place of business at 1-1, Doshomachi 4-chome, Chuoku, Osaka, Japan.  As part of its business, Takeda Ltd. is involved in the research, development,

sales and marketing of pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

23.     Upon information and belief, Defendant Takeda Pharmaceuticals U.S.A. Inc. (f/k/a Takeda Pharmaceuticals North America Inc.) is a Delaware corporation, having a principal place of business at One Takeda Parkway, Deerfield, Illinois 60015. As part of its business, Takeda Pharmaceuticals U.S.A. Inc. is involved in the research, development, sales and marketing of pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

24.     Defendant Takeda Pharmaceuticals International Inc. is an Illinois corporation, having a principal place of business at One Takeda Parkway, Deerfield, IL 60015. As part of its business Takeda Pharmaceuticals International Inc. is involved in the research, development, sales and marketing of pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

25.     Defendant Takeda Global Research & Development Center Inc. is an Illinois corporation, having a principal place of business at One Takeda Parkway, Deerfield, IL 60015. As part of its business, Takeda Global Research & Development Center Inc. is involved in the research, development, sales and marketing of pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

26.     Defendant Takeda California Inc. is a California corporation, having a principal place of business at 10410 Science Center Drive, San Diego, CA 92121. As part of its business, Takeda California Inc. is involved in the research, development, sales and marketing of

pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

27.     Defendant Eli Lilly and Company is an Indiana corporation, having a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  As part of its business, Eli Lilly and Company is involved in the research, development, sales and marketing of pharmaceutical products falling under the jurisdiction and regulation of the U.S. Food and Drug Administration, including Actos and pioglitazone hydrochloride.

28.     Upon information and belief, Defendant Takeda Ltd. is a company domiciled in Japan and is the parent/holding company of Defendants Takeda Pharmaceuticals International Inc., Takeda Pharmaceuticals U.S.A. Inc. (f/k/a Takeda Pharmaceuticals North America Inc.), Takeda Global Research & Development Center Inc., and Takeda California Inc. (referred to collectively with Takeda Ltd. as "Takeda").

29.     Upon information and belief, Defendant Takeda Ltd. exercised and exercises dominion and control over Defendants Takeda Pharmaceuticals International Inc., Takeda Pharmaceuticals U.S.A. Inc. (f/k/a Takeda Pharmaceuticals North America Inc.), Takeda Global Research & Development Center Inc., and Takeda California Inc.

## IV.     APPLICABLE STATUTORY AND REGULATORY PROVISIONS

### A.     <u>The False Claims Act</u>

30.     The federal, state and local governments, through their Medicare, Medicaid, SCHIP, Veterans Health, TriCare (formerly CHAMPUS) and other public healthcare payors, are among the principal purchasers of Takeda's pharmaceutical products.

31.     The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages

sustained by the Government.  31 U.S.C. §§ 3729(a)(1)(A), (B).  The states who are party to this complaint have enacted False Claims Act statutes that apply to Medicaid fraud and/or fraudulent health care claims submitted for payment by state and municipal entities.

B.     **The Medicare Fraud & Abuse/Anti–Kickback Statute**

32.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.  The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

33.     The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose.  *See* 42 U.S.C. § 1320a-7a(a).

34.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals paid as a result of the volume or value of any referrals or business generated.  *See* 42 C.F.R. § 1001.952(f).

35.     Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions.  Kickbacks undermine the integrity of government-funded health benefit programs and increase program expenses by inducing medically unnecessary overutilization of prescription drugs and excessive reimbursements.  Kickbacks also reduce a patient's healthcare choices, as

physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

36. The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). None of the statutory exceptions or regulatory safe harbors protects Defendants' conduct in this case.

37. Recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to clarify that violations of its "anti-kickback" provisions are and have been enforceable under the False Claims Act. The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at § 6402(h).

38. As detailed below, Defendants' marketing of Actos repeatedly violated provisions of the Anti-Kickback Statute by (a) payments to key opinion leaders, (b) payments to physicians, (c) payments to relevant medical organizations, and (d) funding of supposedly objective research. As a result, Defendants violated the False Claims Act because the improper kickbacks and incentives undermined the integrity of the government funded healthcare programs and induced physicians to prescribe Actos when they otherwise would not have done so.

39. Knowingly paying kickbacks to physicians to induce them to prescribe a prescription drug on-label or off-label (or to influence physician prescriptions) for individuals who seek reimbursement for the drug from a federal government health program or causing others to do so, while certifying compliance with the Medicare Anti-Kickback Statute (or while

causing another to so certify), or billing the Government as if in compliance with these laws, violates state and federal False Claims Act.

**C.** **Off-Label Marketing**

40. Defendants' scheme, including the kickbacks and inducements, was directed towards prohibited off-label marketing. The promotion of off-label drugs by drug manufacturers causes the submission of false claims to *inter alia* various government funded health care programs. Medicaid, for example, can only provide reimbursement for covered outpatient drugs. 42 U.S.C. §§ 1396b(i)(10), 1396r-8(a)(3). Covered drugs do not include any drugs "used for a medical indication which is not a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3). Under the statute, a "covered outpatient drug" is a statutorily-defined term that refers to a prescription purpose approved by the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., or "supported by" any of several identified compendia. *See* 42 U.S.C. § 1396r-8(k)(6), § 1396r-8(g)(1)(B)(i) (listing approved "compendia" as the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information (or its successor publications), and the DRUGDEX Information System). A drug does not generally meet the definition of a "covered outpatient drug" if it is prescribed for a use that is neither FDA-approved nor supported by a citation included or approved for inclusion in the compendia. 42 U.S.C. § 1396r-8(k)(3).

41. Indeed, as described herein, it was Takeda's purpose and intent in marketing its drugs off-label for non-medically accepted uses to cause these false claims to be submitted to Medicaid, Medicare, SCHIP, Veterans Health, TriCare (formerly CHAMPUS) and the other government-funded healthcare programs. Coverage of off-label drug use under these programs is similar to coverage under the Medicaid program.

42. No pharmaceutical product has ever received FDA approval for the treatment of prediabetes. Prediabetes is an off-label use of the drug Actos.

## V. THE MARKET FOR ACTOS WAS ENORMOUS AND GROWING

### A. The Development of Thiazolidinediones Widened the Definition of Diabetes

43. In July of 1997, the ADA lowered the *per se* standard for diagnosing diabetes from a fasting plasma glucose (FPG) threshold of 140 mg/dL to 126 mg/dL. It did so in the context of a massive investment by pharmaceutical companies in the TZD class.

44. The first TZD, called ciglitazone, was identified in 1982 by Takeda.[17] In 1986, Takeda synthesized pioglitazone and subsequently licensed it to the Upjohn Company for U.S. development, while, in the same year, the U.S. patent for TZD derivatives was obtained by a Japanese research team and assigned to Sankyo Company Limited ("Sankyo"), a Japanese pharmaceutical company.[18] On November 3, 1994, a study was published in the New England Journal of Medicine of the improvement in glucose tolerance and insulin resistance in obese subjects treated with the TZD compound troglitazone.[19] In March of 1995, Sankyo and Takeda jointly sponsored a Japanese research team to study the effects of troglitazone and pioglitazone on insulin resistance.[20] The following month, on April 28, 1995, Sankyo obtained the U.S.

---

[17] Food and Drug Administration Center for Drug Evaluation and Research, *Seventy-third meeting of the Endocrinologic and Metabolic Drugs Advisory Committee* at 13 (Apr. 23, 1999), http://www.fda.gov/ohrms/dockets/ac/99/transcpt/3507t2a.pdf (last visited Oct. 14, 2014).

[18] U.S. Patent No. 4,572,912 (filed Aug. 28, 1984).

[19] John J. Nolan *et al.*, *Improvement in Glucose Tolerance and Insulin Resistance in Obese Subjects Treated with Troglitazone*, 331 New Eng. J. Med. 1188 (1994).

[20] Hiroshi Maegawa *et al.*, *Thiazolidine Derivatives Ameliorate High Glucose-induced Insulin Resistance via the Normalization of Protein-tyrosine Phosphatase Activities*, 270 J. of Biological Chemistry 7724 (1995).

patent for the use of TZDs for the treatment of insulin resistance in patients in order to prevent or delay onset of Type 2 diabetes.[21]  Meanwhile, the phase two and three studies for Takeda's pioglitazone treatment of Type 2 diabetes were commenced in both the U.S. and Europe in 1996. On January 31, 1997, troglitazone was approved by the FDA as the first TZD for treatment of insulin resistance in cases Type 2 diabetes.[22]  The FDA's approval was achieved on the basis of dozens of clinical studies conducted and/or financed by Sankyo, Parke-Davis and Glaxo Wellcome – a precursor company to GlaxoSmithKline (GSK).[23]  On July 31, 1997, Sankyo licensed troglitazone to Glaxo Wellcome to market the drug in Europe and the UK under the brand name Romozin.[24]  Also prior to 1997, SmithKline Beecham – the other of GSK's two precursor companies – had synthesized its own TZD compound, rosiglitazone, which became the active ingredient in its blockbuster diabetes drug Avandia.  Furthermore, researchers subsidized by the drug companies had begun the TRoglitazone In the Prevention Of Diabetes (TRIPOD) study, which foreshadowed the future market for TZD-based treatments in diabetes prevention –

---

[21] U.S. Patent No. 5,708,012 (filed Apr. 28, 1995).

[22] Warren E. Leary, *New Class of Diabetes Drug Is Approved,* N.Y. Times (Jan. 31, 1997), http://www.nytimes.com/1997/01/31/us/new-class-of-diabetes-drug-is-approved.html (last visited Oct. 7, 2014).

[23] SmithKline Beecham and Glaxo Wellcome merged to form GlaxoSmithKline (GSK) on December 27, 2000.

[24] Neil Sinclair, *Glaxo Wellcome gets approval for Romozi*n, ICIS News (July 31, 1997), http://www.icis.com/Articles/1997/07/31/34199/glaxo-wellcome-gets-approval-for-romozin.html (last visited Oct. 13, 2014).

*i.e.*, prediabetes conditions – and provided further impetus to the ADA to lower the fasting plasma glucose (FPG) threshold for prediabetes in 2003.[25]

45.     In other words, by the time the ADA expert committee lowered the FPG standards for diabetes diagnosis in July of 1997, no fewer than four of the largest global pharmaceutical companies – including Sankyo, Takeda, SmithKline Beecham and Glaxo Wellcome – had been investing heavily for upwards of 15 years in the development of a completely new class of drugs for the treatment of diabetes and, more importantly, the first class of drugs with the potential for treating a completely new class of patient: those with prediabetes.

46.     Takeda made contributions to the ADA, funding Committee Members' and other participating KOLs' clinical research and/or hiring them into their speakers bureau and/or paying them consulting fees.   More specifically, Takeda made undisclosed payments to fund the TRIPOD study and to pay Dr. Thomas A. Buchanan – the lead researcher on the TRIPOD study – for his undisclosed role as a member of both the speakers bureau and Advisory Board of Takeda.  Further, Takeda made undisclosed payments to Dr. Ralph DeFronzo– a member of the ADA Expert Committee that lowered the FPG standards in 1997 and 2003 – to influence the Committee's decisions.  As more fully alleged below, both doctors continued in their roles as paid advocates for the expansion of Actos sales.

47.     In 1999, both Actos and Avandia received FDA approval for treatment of Type 2 diabetes.   On July 15, 1999, the FDA granted "fast track" approval to Takeda's new drug

---

[25] *See* Stanley P. Azen *et al.*, *Design Paper: TRIPOD (TRoglitazone In the Prevention Of Diabetes): A Randomized, Placebo-Controlled Trial of Troglitazone in Women with Prior Gestational Diabetes Mellitus*, 19 Controlled Clinical Trials 217 (1998); Thomas A. Buchanan *et al.*, *Preservation of Pancreatic Beta-Cell Function and Prevention of Type 2 Diabetes by Pharmacological Treatment of Insulin Resistance in High-Risk Hispanic Women*, 51 Diabetes 2796 (2002) ("TRIPOD study").

application ("NDA") for Actos (pioglitazone hydrochloride – tablets 15, 30, and 45 mg) for use in "the improvement of glycemic control in patients with Type 2 diabetes as monotherapy or in combination with a sulfonylurea, metformin, or insulin when diet and the single agent does not result in adequate glycemic control."[26]

48.     To gain FDA approval, pioglitazone underwent lengthy and expensive periods of scientific testing. Results demonstrated that pioglitazone produced medically beneficial results in Type 2 diabetes patients that outweighed the accompanying risks.

49.     On March 21, 2000, Parke-Davis, the manufacturer of Rezulin (troglitazone), agreed to an FDA request to remove it from market, due to clinical evidence going back to 1997 of severe liver toxicity caused by the drug.[27] Over two years prior, on December 1, 1997, Glaxo Wellcome, alarmed at the news of 135 cases of serious liver toxicity and six deaths in the U.S. and Japan, voluntarily withdrew troglitazone from the UK and European markets.

50.     On November 1, 2000, the DREAM study (Diabetes Reduction Assessment With Ramipril and Rosiglitazone Medication), which tested the effectiveness of ramipril and/or rosiglitazone (a TZD) on pre–diabetes/IGT patients over a five and a half year period, commenced with financial support from SmithKline Beecham, among others.[28] It was the first

---

[26] Letter from John K. Jenkins, Director, Office of Drug Evaluation II, to Mikihiko Obayashi, President of Takeda America Research & Development Center, Inc. (July 15, 1999).

[27] David Willman, *Rezulin Fast-Track Approval and a Slow Withdrawal*, L.A. Times (Dec. 20, 2000), http://www.latimes.com/nation/la-122001rezulin-story.html (last visited Oct. 13, 2014).

[28] *See McMaster research team awarded $25 million for diabetes clinical trial*, McMaster University (Nov. 1, 2000), http://fhs.mcmaster.ca/main/news/news_archives/dream.htm (last visited Oct. 13, 2014); *The DREAM (Diabetes Reduction Assessment With Ramipril and Rosiglitazone Medication) Trial*, ClinicalTrials.gov, http://clinicaltrials.gov/show/NCT00095654 (last visited Oct. 13, 2014).

prediabetes trial for GSK's future blockbuster drug, Avandia. The criterion for inclusion of patient subjects in the study was an FPG of between 95 mg/dL and 126 mg/dL; the ADA had by this time lowered the boundary of patients considered to be diabetic to 126 mg/dL, substantially broadening the patient market.[29]

51. In or about early 2002, Takeda funded its own prediabetes study: the PIPOD (Pioglitazone In Prevention Of Diabetes) study. PIPOD was, in effect, a continuation of the TRIPOD study with pioglitazone replacing troglitazone after the latter's removal from the market, due to liver toxicity problems. PIPOD was a three and a half year study – ultimately submitted for publication in August of 2005 – of pioglitazone on diabetes risk in subjects with prior gestational diabetes who had also taken part in the TRIPOD study and who were at high risk for developing Type 2 diabetes.[30] The PIPOD study was funded by a grant from Takeda and showed that one of its authors – Dr. Buchanan, who had been the lead author of the TRIPOD study – "has been on a speakers bureau for and has received consulting fees from Takeda."[31] On information and belief, Dr. Buchanan's financial relationship with Takeda began earlier and no later than the time of his involvement in the TRIPOD study.

---

[29] H. C. Gerstein *et al.*, *Effect of Rosiglitazone on the Frequency of Diabetes in Patients With Impaired Glucose Tolerance or Impaired Fasting Glucose: A Randomised Controlled Trial*, 368 Lancet 1096 (2006).

[30] Anny H. Xiang *et al.*, *Effect Of Pioglitazone on Pancreatic Beta-Cell Function and Diabetes Risk in Hispanic Women With Prior Gestational Diabetes*, 55 Diabetes 517-22 (2006) (the "PIPOD Study").

[31] *Id.* at 517.

52. In January 2003, the ADA issued its Follow Up Report, lowering the *per se* standard for diagnosing prediabetes from an FPG of 110 mg/dL to 100 mg/dL,[32] expanding the IGT patient population and citing the TRIPOD study's improvement in insulin resistance and Beta-cell function as part of the impetus for doing so, notwithstanding (and not mentioning) the fact that troglitazone – the subject of the TRIPOD study, whose lead author had been Dr. Buchanan, a Takeda-paid consultant member of the Takeda speakers bureau – had been withdrawn from the market for causing dangerous and often fatal liver toxicity in patients. Moreover, Dr. DeFronzo – also a Takeda-paid consultant member of the Takeda speakers bureau – was a member of the ADA Expert Committee which issued the 2003 recommendation.

53. Among the justifications for re-opening the 1997 diagnostic standards for diabetes and prediabetes, the 2003 ADA Follow Up Report cited to new evidence emerging from "major clinical trials" showing that "the progression from IGT to diabetes could be delayed or prevented by a treatment intervention" including "intensive lifestyle modification (nutritional and exercise interventions)" and the use of several new pharmaceuticals exhibiting positive clinical results, including, among others, metformin and "a thiazolidinedione drug (troglitazone)," which was found – in the TRIPOD study – to have reduced the incidence of diabetes in high-risk women with prior gestational diabetes by improving their insulin resistance and beta-cell function.[33]

54. In other words, by the ADA's own admission, the ADA's de facto expansion of the prediabetic patient populations through the lowering of FPG thresholds was driven, in part,

_____

[32] *See* The Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, *Follow-up Report on the Diagnosis of Diabetes Mellitus,* 26 Diabetes Care 3160, 3162 (2003) (the "2003 ADA Follow Up Report").

[33] *Id.* citing Buchanan, TRIPOD study, 51 Diabetes 2796-2803 (2002).

by the availability of new experimental drugs like metformin and TZDs like troglitazone to treat prediabetes, rather than on the basis of an analysis of the total benefits versus total risks to the patient population. Indeed, the expert committee acknowledged that with respect to the changes to the prediabetes standard, they did "not yet know the total benefit or the total cost to an individual who is designated at risk for diabetes […] by any criteria."[34] Doctors David L. Schringer and Brett Lorber criticized the 2003 ADA the expert committee's recommendation to lower the prediabetes standard, arguing that it "is not based on the logical analysis of good quality evidence regarding patient outcomes. It is not 'evidence-based.' It is conjecture and opinion."[35]

55. The ADA changed the FPG thresholds in the absence of a bona fide risk benefit analysis in the face of an aggressive campaign by Takeda and other drug companies to influence the ADA and thereby expand the market for diabetes patients for a new class of drugs – TZDs – under development by Takeda and other companies, which clinical studies had shown to be effective in improving glycemic control in patients with Type 2 diabetes.

56. Relator alleges that Takeda – through payments to Dr. Buchanan, Dr. DeFronzo and other ADA Expert Committee members as well as to the ADA directly – influenced the ADA's 2003 decision to lower the FPG standards for prediabetes in order to create a larger patient market for TZDs and other prediabetes treatments that were under development or due to enter the market in the near future.

---

[34] *Id.* at 3162.

[35] David L. Schriger & Brett Lorber, *Lowering the Cut Point for Impaired Fasting Glucose*, 27 Diabetes Care 592, 594 (2004).

57.     Having successfully lobbied the ADA to loosen FPG standards for diabetes and prediabetes diagnoses and further having obtained FDA approval for their blockbuster competing TZDs, Takeda, in partnership with Lilly from 1999 through 2006, began a battle for market share for Actos against GSK's Avandia – which had been FDA-approved for treatment of Type 2 diabetes on May 25, 1999 – in the newly expanded patient populations.  This included competition for patients with Type 2 diabetes as well as those with prediabetes.  In order to compete for prediabetes patients, Takeda and Lilly formulated a scheme to increase the sales of Actos while avoiding the substantial expense and delay of petitioning the FDA for approval of expanded or additional uses of Actos.  This scheme consisted of an elaborate and clandestine promotion of off-label uses of Actos, all in direct contravention of rules and regulations of the FDA and the Health Care Finance Agency.

**B.      The Potential, Expanded Prediabetes Market is Enormous**

58.     According to data from The International Diabetes Federation, about 382 million people on earth now have diabetes, with an estimated 592 million by the year 2035 – a 55% increase.[36]  According to the Centers for Disease Control and Prevention, 29.1 million or 9.3% of all Americans had diabetes as of 2012, with an alarming 8.1 million (27.8%) of them undiagnosed.  About 86 million or 37% of Americans over the age of 20 are considered prediabetic/IGT.[37]  The market for Type 2 Diabetes treatment options is exponentially increasing – current worth estimates are approximately $10 billion in the United States and are predicted to increase to $30 billion by 2030.

---

[36] *Diabetes: Facts and Figures,* International Diabetes Federation, http://www.idf.org/worlddiabetesday/toolkit/gp/facts-figures (last visited Oct. 16, 2014).

[37] *National Diabetes Statistics Report, 2014*, Centers for Disease Control and Prevention, http://www.cdc.gov/diabetes/pubs/estimates14.htm (last visited Oct. 20, 2014).

59.     In 1997, when the American Diabetes Association lowered the *per se* standard for diagnosing diabetes from an FPG level of 140 mg/dL to 126 mg/dL, it observed that: "adoption of the new criteria may […] have a large impact on the number of people actually diagnosed with diabetes.  Presently, about half the adults with diabetes in the U.S. are undiagnosed, but many might now be diagnosed" under the new criteria.[38]  Doctors Steven Woolf and Stephen Rothemich reported in the journal *American Family Physician* that among American adults this redefinition increased the number of diabetics by nearly 50 percent:

> Lowering the diagnostic threshold shifts the definition of diabetes into the central bulge of the bell curve where the glucose level of most Americans falls. Among U.S. adults 40 to 74 years of age who have not been diagnosed with diabetes, 1.9 million have fasting plasma glucose levels of 126 to 140 mg per dL (7.0 to 7.8 mmol per L), which is almost as many as the 2.2 million who have levels over 140 mg per dL (7.8 mmol per L). Under the new guidelines, ***at least 1 million Americans (and possibly more) with fasting plasma glucose levels of 126 to 140 mg per dL (7.0 to 7.8 mmol per L), who previously would have been told that they had normal (or impaired) glucose tolerance, will now be informed that they harbor a disease*** ... The evidence used for the new diagnostic criteria is from epidemiologic studies […] that show a progressive increase in the risk of complications beginning with fasting plasma glucose levels as low as 110 to 120 mg per dL (6.1 to 6.7 mmol per L). There are three problems with basing the new policy on these data. First, other studies show no increase in risk at these low levels. Second, even if risk is increased, the new policy argues that having a risk factor (a mildly elevated fasting plasma glucose level) is tantamount to having a disease ... Third, and most important, ***there is no prospective evidence that correcting these mild elevations improves health*** ... Whether normalizing fasting plasma glucose levels in the range of 126 to 140 mg per dL (7.0 to

---

[38] The Expert Committee On the Diagnosis and Classification of Diabetes Mellitus, *Report of the Expert Committee on the Diagnosis and Classification of Diabetes Mellitus*, 20 Diabetes Care 1183, 1193 (1997).

7.8 mmol per L) has a meaningful impact on patient outcomes is unknown.[39]

60.　Similarly, when the ADA's expert committee lowered the *per se* standard for diagnosing prediabetes from an FPG of 110 mg/dL to 100 mg/dL in 2003,[40] it increased the number of Americans considered to have prediabetes/IGT thereby expanding by large increments the market of Americans diagnosed with conditions for which pharmaceutical solutions might potentially be prescribed.

### C.　The ADA Supported Limited Treatment for Prediabetic Conditions in 2007

61.　In October 2006, the American Diabetes Association held a "consensus development conference…focusing on the pre-diabetic states of IFG [impaired fasting glucose] and IGT [impaired glucose tolerance]."　At the completion of the conference, "a seven member panel of experts in diabetes, endocrinology, and metabolism" produced a consensus statement that was published in the March 2007 issue of *Diabetes Care* (the "2007 ADA Consensus Statement").[41]　*Diabetes Care* is a journal published by the American Diabetes Association "for the health care practitioner" and "intended to increase knowledge, stimulate research, and promote better management of people with diabetes."　The 2007 ADA Consensus Statement referenced eight major clinical trials　conducted "[b]etween 1997 and 2006…[that] examined whether lifestyle or pharmacologic interventions would prevent or delay the development of diabetes in populations at high risk by virtue of having IFG and/or IGT" and explained that

---

[39] Steven H. Woolf, Stephen F. Rothemich, *New Diabetes Guidelines: A Closer Look at the Evidence*, 58 American Family Physician 1287, 1287-88 (1998) (emphasis added).

[40] 2003 ADA Follow Up Report, *supra* n.32, 26 Diabetes Care at 3162.

[41] David M. Nathan *et al.*, *Consensus Statement: Impaired Fasting Glucose and Impaired Glucose Tolerance*, 30 Diabetes Care 753 (2007) (the "2007 ADA Consensus Statement").

"[t]he largest reductions (~60%) were accomplished with lifestyle interventions aimed at weight loss and increasing physical activity and with thiazolidinediones" [i.e., pharmaceutical products like Actos and Avandia]. After reviewing the available research and debating the best way to prevent diabetes without causing serious negative side-effects, the panel concluded that "lifestyle modification therapy emphasizing modest weight loss (5-10% of body wt) and moderate-intensity physical activity (~30 min daily) is the treatment of choice for individuals with IFG/IGT." Due to safety concerns surrounding TZDs and inadequate research on other chemical treatments, the panel recommended very limited use of the drug metformin as the only acceptable pharmacological prediabetes treatment. Dr. DeFronzo was a contributor to the 2007 ADA Consensus Statement.

D. **Takeda Contracts Dr. DeFronzo to Conduct a Study of Actos to Contradict the ADA Consensus And Expand the Market for Actos to Prediabetes**

62. As discussed in greater length in the paragraphs below, Takeda engaged Dr. DeFronzo to contradict the limited recommendations of the ADA Consensus Statement. Around the time that *Diabetes Care* published the 2007 ADA Consensus Statement in March 2007, Dr. DeFronzo signed on with Takeda as lead author of the Actos Now for the Prevention of Diabetes (the ACT NOW study). The ACT NOW study "examine[d] whether pioglitazone (ACTOS®) c[ould] prevent progression of IGT to Type 2 diabetes mellitus (T2DM) in a prospective randomized, double blind, placebo controlled trial." The study administered pioglitazone or placebo to 602 IGT subjects and measured their fasting glucose levels quarterly for an average of 2.4 years. Oral glucose tolerance tests were performed every year. Dr. DeFronzo then used ADA criteria to determine occurrences of Type 2 Diabetes. The study was primarily funded by a

research grant from Takeda Pharmaceuticals North America (n/k/a Takeda Pharmaceuticals U.S.A. Inc.).[42]

## VI. TAKEDA AND LILLY ILLEGALLY PROMOTED ACTOS FOR OFF-LABEL USE

63. The uses of Actos for prediabetes/IGT are not recognized as medically accepted uses by the American Hospital Formulary Service Drug Information, United States Pharmacopeia-Drug Information, the DRUGDEX Information System, or any peer-reviewed medical literature. Thus, these off-label uses are beyond the scope of uses designated by federal law and regulation, in particular 42 U.S.C. § 1396r-8, as eligible coverage by the Medicare and Medicaid programs.

64. Defendants did not take the steps necessary to have Actos approved to treat prediabetes/IGT as a medically accepted use. Rather, Defendants made an end run around the regulations in order to take advantage of an enormous, off-label market.

### A. Relator Learns of Defendants' Illegal Conduct

65. While at SmithKline Beecham (later GlaxoSmithKline plc), Mr. Lawton obtained first-hand knowledge of Takeda's involvement in the facts herein alleged, including, among others, the facts pertaining to the ADA's decisions to lower the *per se* fasting blood glucose level standards for diabetes and IGT diagnosis.

66. As described above, in the course of his work for SmithKline Beecham, Mr. Lawton also obtained extensive expertise in evaluating patent and marketing strategies for pharmaceutical products.

---

[42] Ralph A. DeFronzo *et al.*, *Actos Now for the Prevention of Diabetes (ACT-NOW) Study*, 9 BMC Endocrine Disorders 1-8 (2009) (the "ACT NOW study").

67.	In 1999, the FDA approved SmithKline Beecham's drug Avandia to treat people with Type II diabetes.  Both before and after Avandia was approved, Mr. Lawton was involved in extensive internal discussions about the intellectual property protection and marketing plans for Avandia.  In connection with his work on the drug Avandia, Mr. Lawton learned of the marketing and patent situation of Avandia rival, Actos, which was produced and marketed by Takeda.

68.	Mr. Lawton was part of a team working on Avandia when representatives from Takeda approached SmithKline Beecham to discuss whether the intellectual property regimes of the two competing drugs were in conflict.  Takeda was considering whether to bring a patent infringement case against SmithKline Beecham related to the sales of Avandia.  In these interactions with the team, Mr. Lawton became very familiar with the intellectual property regime for Actos and the marketing direction that Takeda was taking for this diabetes drug.  Mr. Lawton knew that Takeda was aware of the potential gains from off-label marketing to people who were considered prediabetic.

69.	In 2001, GlaxoSmithKline representatives, including Mr. Lawton, and Takeda representatives, including Dr. DeFronzo, met in Washington D.C. to discuss the intellectual property rights of Actos and Avandia.  Each company had intellectual property rights for their diabetes medication and contended that the other was infringing on their patents. Mr. Lawton was present at the meeting as a company representative experienced in patent law and the science underlying the patents.

70.	It was at this meeting that Mr. Lawton met Dr. DeFronzo.  Dr. DeFronzo was a diabetes expert and was at the meeting as the scientific voice of Takeda in their discussion with GSK.

71.     At this meeting, Dr. DeFronzo casually spoke to Mr. Lawton about aspects of the financial relationship he had with Takeda.  Dr. DeFronzo told Mr. Lawton that he was receiving $1,000/hour for the time that he spent working with Takeda on intellectual property and presumably other matters.  He also said that Takeda paid him $3,500 a day for short speaking engagements.  During this meeting Dr. DeFronzo also suggested that he had some other financial interests associated with Actos.  After the conclusion of this meeting, it became clear to Mr. Lawton that Takeda intended to pursue an off-label marketing approach to push Actos into the prediabetes market, and that Takeda would use Dr. DeFronzo, its highly paid consultant, as a resource to gain an advantage in this marketing push.

72.     During 2001 through 2003, Mr. Lawton participated in regular meetings with the GSK Avandia project team, which included GSK senior executives.  During these meetings, Mr. Lawton participated in and was privy to numerous conversations regarding the Takeda strategy to market Actos off-label for prediabetes, the facts of which were well known by GSK team members, including then team leader Hamish Ross and marketing executive David Brand.  The information about Takeda's Actos campaign was largely obtained from GSK's corporate intelligence group, which maintained ongoing relationships and information exchanges with counterparts within Takeda.  The reason for GSK's interest in Takeda's off-label prediabetes campaign for Actos was that GSK was considering marketing options to boost Avandia sales.  GSK's corporate intelligence group had learned from its Takeda counterparts that, prior to the off-label campaign, only 5% of Actos sales were for off-label prescriptions, whereas, after the marketing campaign was underway, 30% of all Actos sales were for off-label uses.

73.     In or around the fall of 2009, Mr. Lawton conducted a series of three job interviews with Takeda in London, UK.  The first two interviews were attended by: 1) a Takeda

Human Resources Representative; 2) Bryan Driscoll, Takeda's General Counsel of UK business; and 3) Yoichi Okumura, Takeda's Acting Head of European Patents. The second interview was attended by these same Takeda employees and also attended by the COO of Takeda's European Pharmaceutical Business (the "COO"). The third interview was attended only by Bryan Driscoll and Atsuhiro Inaba, Takeda's Head of Global Patents. The interviews lasted roughly 5, 8 and 1.5 hours, respectively.

74. The interviews began with Mr. Lawton responding to questions about his background at GSK, in particular his experience and approaches towards late-stage life-cycle management of various GSK compounds, including: Avandia, Paxil, Ropinirole, Augmentin XR, SR, CR, Corega CR. Mr. Lawton and his interviewers discussed how he had handled life-cycle management of the various GSK compounds, particularly in terms of their late stage development. Mr. Lawton described how he had pursued traditional means of strategic use patenting – including launching new dosages and/or combination dosages – and strategic patent litigation with competing drug companies in order to develop and maintain market-share.

75. Mr. Lawton was then asked how he would approach life-cycle management at Takeda, namely, how would he maximize the value of Actos, given that – as both Okumura and the COO pointed out – Actos was Takeda's sole money-making drug and, furthermore, it was in its late commercial stage, due to go off patent in 2011. Okumura and the COO outlined the two-pronged Actos strategy that Takeda had pursued to date, which consisted of 1) development of combination therapies with Actos, in particular with Metformin and 2) an aggressive off-label marketing campaign for Actos as a treatment for hyperglycemia generally and, in particular, as a treatment for IGT in patients with prediabetes.

76.     When Mr. Lawton proposed maximizing Actos' value through the pursuit of use patents for the types of IGT and hyperglycemia treatments for which Takeda had been conducting its off-label marketing campaign, the COO indicated that Takeda had already explored that strategy and decided against it.  The COO explained to Mr. Lawton that, given that any of the uses – including IGT and hyperglycemia – for which Takeda might desire to obtain patent protection, were essentially treatments for prediabetes, the FDA would never approve them.  Even if Takeda were able to gain FDA approval for such use patents, the actual molecule patent for Actos only applied to non-IGT uses; therefore, none of the generic alternatives to Actos that would be flooding the market in 2011, when Actos went off patent, would be held as infringing such use patents.  Furthermore, obtaining use patents for such uses – and listing them in the Orange Book and on Actos labeling – would essentially constitute an admission both to the FDA and to competitors that Takeda was engaging in illegal off-label marketing for the patented uses and would, therefore, be a waste of money.  Takeda did not want to draw governmental scrutiny of their off-label strategy, which, the COO told Mr. Lawton, was currently "in full swing" and had had an "explosive" positive effect on Actos sales.

**B.     The Takeda/Lilly Marketing Machine Off-Label Markets Actos**

77.     Takeda's and Lilly's specific off-label marketing strategies for Actos grew out of Takeda's overall Actos (on-label and off-label) marketing buildup beginning around 1996, as corroborated in the recent testimony from the Actos Trial (*In Re: Actos (Pioglitazone) Products Liability Litigation*) in which a Louisiana jury in April 2014 awarded plaintiffs millions in damages against Takeda and Lilly for misrepresentation of Actos' bladder cancer risk.

78.    Key testimony came from Dr. Robert Spanheimer,[43] a paid member of Takeda's speakers bureau and a subsequent Takeda employee; Dr. Claire Thom, a Doctor in Clinical Pharmacy and employee of Takeda since 2000 serving, during times relevant to the instant matter, as Vice President of research and development (including marketing R&D) of Takeda;[44] and Ronald Hoven, Senior Director of Global Marketing for insulins and devices at Lilly during Takeda's Actos marketing partnership with Lilly from 1999 to 2006.[45]   According to Dr. Thom's testimony, at the time of her hiring in 2000 – one year after the FDA approved Actos for treatment of diabetes – not only was Actos the only drug on Takeda's sales roster, but the Japanese company of Takeda as a whole was "making a deliberate effort to change from a broad chemical company to being a pharmaceutical company and is pushing resources into pharmaceuticals."[46]   As such, Takeda was diverting all of its resources into marketing Actos.[47] This was reflected in Takeda's boosting of its Actos sales force by 50% at the outset of its Actos U.S. marketing partnership with Lilly in 1999.[48]

---

[43] Dr. Spanheimer was a member of the Takeda speakers bureau while acting as Interim Director for Endocrinology at the University of Iowa before serving as full time Director of Diabetes and Metabolism and Endocrinology at Takeda from March 2005 until 2007 at a starting salary of $195,000 with a 25% bonus target. He later served as Takeda's cardiovascular Global Research and Development Director.  Jury Trial Transcript at 1936–37, Vol. XIV; 3548, Vol. XXIV; and 3832, Vol. XXV.

[44] Jury Trial Transcript at 1238-41, Vol. X.

[45] Jury Trial Transcript at 2045, Vol. XIV.

[46] Jury Trial Transcript at 1308-09, 1316, Vol. X.

[47] *Id.*

[48] Jury Trial Transcript at 2045, Vol. XIV.

79.     Beginning in 1999, Takeda entered into a partnership with Lilly – contemplated through 2006 – for the marketing of Actos.  A November 10, 1999 Takeda/Lilly Executive Policy Committee meeting presentation spelled out the control structure, co-responsibilities and core Actos messaging strategies for the alliance.  Among the listed initiatives was the "Exchange of Safety Information" (i.e., pooling of data for studies, publications) and "[i]mproved communication and collaboration between Lilly and Takeda […] to share pharmacovigilance information" and for "Lilly to provide examples of targeted surveillance and data mining to Takeda."[49]  Further, the core "market strategy and positioning" would "be integrated into the glycemic control strategy for diabetes care" and would focus on the promotion of Actos for "long term glycemic control."[50]

80.     The Actos Trial testimony provides further evidence of a robust and well-funded Actos marketing machine within the Takeda and Lilly partnership, driving up Actos sales through the sophisticated conflation of scientific and marketing functions along with three main marketing initiatives: public speaking, publications and direct sales force contact with prescribing physicians.  The common approach being to hire and develop a coterie of highly impressionable, reliable and authoritative health care practitioners to give speeches and endorse publications purporting to be purely disinterested scientific content, but which, in fact, were speeches and/or publications produced by Takeda itself and delivered by these hired KOLs under conditions of heavy coaching and financial inducements to boost Actos sales at the expense of legitimate science.

---

[49] Ex. P3720-00002, 00008-9 to Jury Trial.

[50] *Id.* at P3720-00023.

81.     These inducements to KOLs went beyond direct payments.  As Actos Trial testimony from Ronald Hoven reveals, a key component of the Actos joint promotional partnership between Lilly and Takeda was keeping KOLs happy by providing them with indirect financial support for their research through the KOLs' institutions or offices.  As one trial exhibit from Hoven's office files states: "[f]inancial Support for Educational and Research Initiatives Remain the Most Desired Item a Medical Liaison can Provide Thought Leaders."[51]

### a.     Speakers Bureau – CME

82.     Another core initiative was Takeda's sponsorship of numerous Continuing Medical Education events (CMEs), where paid members of Takeda's speakers bureau, among them Dr. Spanheimer, gave presentations to practitioners of purportedly scientific – i.e., in conformity with CME regulations – content that, in reality, was marketing content intended to boost Actos prescriptions.  Some of the CMEs were free dinners for participants, which Takeda paid for as a vehicle for accumulating contacts with participants of 1200 or more.[52]

83.     While CMEs are regulated to require scientific content only, Takeda referred internally to its speakers bureau members' CME presentations as "professional strategies" and developed the content of such presentations out of its marketing department.  As part of these professional strategies, Takeda and Lilly established a quasi-scientific "[i]ndependent educational program," as it was billed in CME brochures, called The National Diabetes Education Initiative (NDEI).  Takeda claimed, without foundation, that NDEI was "[h]ighly respected among physicians and allied health care professionals for quality of comment," implying that NDEI was fundamentally a scientific education initiative.  In reality, among its

---

[51] Jury Trial Transcript at 2106-07, Vol. XV.

[52] Jury Trial Transcript at 1923, Vol. XIV.

"Educational Goals" was to "[m]ove [the Actos] treatment paradigm beyond glycemic control […] [t]o insulin resistance syndrome," which, as further detailed herein, was part of Takeda/Lilly alliance's core marketing strategy for expanding the use of Actos to ever-earlier stages of IGT/prediabetic conditions. Indeed, one of the factors cited in the CME materials for NDEI's "Proven Reputation" was NDEI's proven ability "to motivate positive physician behavior based on post-program survey data" – i.e., NDEI's goal was not fundamentally to educate but, rather, to change behavior.[53]

84. Members of the Takeda speakers bureau were carefully chosen and vetted by the Takeda and/or Lilly marketing department before being deemed "suitable" for a request to speak.[54] Before they were allowed to speak at a CME they were required to attend three-day training sessions with teams of medical professionals, lawyers and members of the Takeda marketing department on the content and style of the CME presentation to ensure that presenters succeeded in relaying the sanctioned Actos sales pitch while maintaining the requisite guise of pure scientific independence.[55] Frequent CME speakers such as Dr. Spanheimer, would be assigned an individual contact "to work with each frequent speaker for continuity."[56] For example, in a May 2010 Actos Trial document entitled: "Notes from Strategy Session with Bob Spanheimer," the strategy contract outlined heavily coached "tactics" for Dr. Spanheimer to employ in order to respond to challenges to "his company's ethics," to deflect scrutiny and circumscribe the amount of information given to attendees of his presentations:

---

[53] Ex. P6037-00020-22 to Jury Trial.

[54] Ex. P0488-00039 to Jury Trial.

[55] Jury Trial Transcript at 1916-25, Vol. XIV.

[56] Ex. P6037-00035 to Jury Trial.

In this meeting, Bob showed himself to be a good listener and *skilled strategist*. Also wise on *tactics* [...] What gets his goat? Challenging his or his company's ethics; we talked about how 'In fact' and 'Actually' might *get him out of that hot water*. Chief concern, of which Bob is aware: *His answers can go on, perhaps too expansively*. We agree that *'economy' is the watchword moving forward*, and PT encouraged Bob to begin listening and expressing himself with more economy ("get to where it feels awkward"). Exercises to follow. Note that Bob showed both 'rational Bob' and 'diplomatic Bob.' PT thinks the former will be of use as well as the latter, which comes naturally to Bob.[57]

85.     For one particular Actos CME in Illinois for physicians' assistants (PAs) at which Dr. Spanheimer presented "scientific" content, it was stated internally by Takeda's marketing department that "Dr. Spanheimer did an excellent job selling insulin resistance and *promoting Actos*. He told the PA's why Actos was the number one TZD . . ." He "put to rest many of the objections/myths we hear on a regular basis. He addressed the handling of edema/weight gain and put to rest the cost, [congestive heart failure], and dosing issues." The "PA's loved the speaker and made several positive comments after the program. Several of the PA's stopped by the Takeda/Lilly booth, and all of them attended the CME program that was sponsored by Takeda." Further, Tom Sawyer – a member of the Takeda marketing team – instructed his sales team to document the names of those PAs in attendance at the CME who also appear in any individual salesperson's database as having attended, stating: "[t]his *will help Takeda officially calculate the proper return on investment*" [in Dr. Spanheimer as a speaker].[58]

---

[57] Ex. P7440-00001 to Jury Trial (emphasis added).

[58] Ex. P6036-00002 to Jury Trial (emphasis added)

86.     Notwithstanding his exemplary performance on the Takeda speakers bureau, Dr. Spanheimer left Takeda CMEs off of his formal resume, although he was required to include them.[59]

### b.      Publications – Ghostwriting

87.     Takeda also exerted rigorous control over TZD–related publications, recognizing the importance of quasi-scientific publications – as another major prong of its Actos marketing strategy – for driving drug sales.   One Takeda internal presentation on the subject of TZD publications stated: "[p]ublication strategies are critical to the long-term success of a compound;" further, on another slide, asking, "[w]hy is the Strategic Publication Plan important?" and answering: "sales increases."[60]    According to the presentation, Takeda's "Publication Strategy" dictated that:

> It will be important to prospectively plan global release of preclinical and clinical data and it will be particularly important to carefully integrate relevant market preparatory publications into our overall publications efforts.   These integrated activities – in conjunction with planned educational and marketing efforts – will pave the way for timely product acceptance and adoption by relevant physician and nonphysician audiences.[61]

88.     Takeda's publication strategy centered on a robust publication "sponsor[ship]" program, wherein Takeda systematically developed and ghostwrote quasi-scientific publications designed to provide favorable support for Takeda's core Actos marketing messages.   The quasi-scientific content of the proposed publications were shaped to fit the marketing message, some of which – according to internal Takeda documents – included: "Message 1: Actos directly reduces

---

[59] Jury Trial Transcript at 1934, Vol. XIV; Ex. D2740 to Jury Trial.

[60] Ex. P7125-00005-6 to Jury Trial.

[61] *Id.* at P7125-00009.

insulin resistance" and "Actos versus Avandia. Primary objective Actos is superior to Avandia in reduction of TG [triglycerides]" and "Actos in combination with insulin" … "Improves glycemic control better than insulin alone."[62]

89. For each marketing message, Takeda's marketing department, as "sponsor," would propose a publication, select and develop the supporting data, specify the standards for interpreting the data, specify the "endpoints" or parameters of the scientific questions to be addressed in the publication, engage Takeda employees and/or third-party contractors to ghostwrite the publication and, finally, select one or more KOLs to sign on as the official "authors" of the publication, despite all relevant aspects of the publication having already been carried out by Takeda itself.[63] Among the marketing department's internally stated justifications for this process was that "[g]hostwriters are required in order to assure timely progress."[64] In other words, ghostwriting was required for "progress" in driving Actos sales.

90. Takeda employed a third-party company headed by Susan Crawford to produce a large proportion of its ghostwritten publications for the Actos campaign, such that one Takeda employee referred to the Actos publications group as "a manuscript factory."[65] Crawford's ghostwriting services became particularly important in spinning the marketing message to maximize the impact of the PROactive study results, which failed to meet Takeda's desired safety endpoints, in or about 2005. Accordingly, as Mehmood Khan, Senior Vice President of

---

[62] Jury Trial Transcript at 1959-62, Vol. XIV.

[63] *Id.* at 1966-68, 1997-98, 2003.

[64] *Id.* at 1968.

[65] Ex. P6063-00001 to Jury Trial.

Medical & Scientific Affairs at Takeda, proposed in November 2005, the PROactive campaign would involve the formation of an internal team:

> to be charged with suggesting and developing analysis that should be done, performing preliminary analysis and as appropriate then forwarding to the ProActive Exec team for input. We would be happy to provide all necessary support to draft, format and submit abstracts at [Takeda]. In our opinion if Takeda is to maximize this last opportunity to get a significant presence at the ADA in light of obvious changes in the marketplace and our absence to date at US meetings *we need to generate approx 20 to 30 abstracts* which is quite achievable only if we move ahead immediately. […] This proposal was developed as a result of our need to efficiently submit a maximal number of abstracts at the ADA this year.[66]

91. Among the publications that were ghostwritten by Susan Crawford's company was one entitled "PROactive: Time for a critical appraisal" for which Dr. DeFronzo and Dr. Robert J. Chilton[67] – colleagues at The University of Texas Health Science Center at San Antonio, San Antonio, TX, USA as well as co-authors of the ACT NOW study – were both later recruited as "co-authors." The paper was published in the European Heart Journal in 2008.[68] As outlined in greater detail herein *infra*, the PROactive study was sponsored by Takeda with the hope of producing data supporting the primary endpoint that Actos was not only safe, but, in fact, beneficial in terms of its cardiovascular (CV) effects on study subjects. While the PROactive study did provide evidence that Actos' CV outcomes were neutral, it failed to show any CV benefits with statistical significance. Nevertheless, despite acknowledging the failure of the study to prove its primary CV endpoints, the "PROactive: Time for a critical appraisal" article –

---

[66] Ex. P2127-00002 to Jury Trial.

[67] *Id.*

[68] John D. Betteridge *et al.*, *PROactive: time for a critical appraisal,* 29 European Heart J. 969 (2008).

as ghostwritten by Susan Crawford's firm and "authored" by paid author–endorsees DeFronzo and Chilton – argued that the study established the "clinical significance" of a positive CV effect of Actos and that "doubts over the clinical significance of PROactive are a consequence of the wrong choice of composite endpoint …If the main secondary endpoint had been chosen as the primary endpoint, then, no doubt, the macrovascular benefits of pioglitazone in secondary prevention would be more universally accepted." Further, the article argued misleadingly that "the metabolic benefits of pioglitazone – notably the improved glycemic and lipid control and delayed need for insulin use – are highly clinically relevant" and superior to the lipid effects of rosiglitazone (Avandia), Actos' main market competitor.

92. Susan Crawford's company also ghostwrote a publication entitled "Cardiovascular risk and thiazolidinediones – what do meta-analyses really tell us?" that was published in 2010 in the journal *Diabetes, Obesity and Metabolism* and for which Dr. Chilton was also recruited as a "co-author."[69] This paper also analyzed the PROactive study results, acknowledging that "[t]here was no statistically significant impact on the primary composite macrovascular endpoint,"[70] but, asserted misleadingly that CV effects were nevertheless positive: "there was a significant reduction in the principal secondary composite endpoint of all-cause mortality, MI or stroke, as well as a host of other composite macrovascular endpoints (including CV mortality, MI or stroke), and in the risks of recurrent MI and recurrent stroke events."[71] Further, the paper went on to point out the inferior CV and lipid effects of Avandia, asserting

---

[69] Ex. P6063-00001 to Jury Trial.

[70] G. Schernthaner & R. J. Chilton, *Cardiovascular risk and thiazolidinediones – what do meta-analyses really tell us?*, 12 Diabetes, Obesity and Metabolism 1023, 1030 (2010).

[71] *Id.*

that: "a recent analysis of heart failure events in the RECORD study revealed a greater number of heart failure-related deaths with rosiglitazone (10 events) compared with the comparator group (two events), prompting the authors to conclude that (at least in some cases) rosiglitazone-related heart failure may not be benign;" and that "[s]ome potentially important differences do exist between the TZDs in their effects on plasma lipid levels" as recent "double-blind, head-to-head RCTs [randomized controlled trials] in patients with Type 2 diabetes and dyslipidaemia, pioglitazone showed significant benefits over rosiglitazone."[72]

93.     The Actos Trial documents reveal Lilly's close integration with Takeda's publication strategy during relevant periods. For the PROactive promotional period in or about 2004 to 2006, Lilly's planning documents lay out a strategy to inundate the ADA, the journal of the European Association for the Study of Diabetes (EASD) and other major journals with an "avalanche" of PROactive data study abstracts and publications designed to overwhelm GSK submissions on behalf of Avandia.[73] As with Takeda, all publications were to be organized "by message" and/or "by disclosure type" and "with target dates."[74] Additionally, Lilly planned the creation of a communal Takeda/Lilly web-database on which to upload all Actos speakers bureau slides, speaker training materials and other shared marketing materials; furthermore, the database would pool all of Takeda and Lilly's respective Actos clinical trial data to go towards the messaging and designing of pro-TZD publications.[75] The stated objective for the database being to "[p]rovide both Lilly and Takeda a publication/clinical tracking tool accessible through

---

[72] *Id*. at 1031.

[73] Ex. P0488-00027-32 to Jury Trial.

[74] *Id.*

[75] *Id.* at P0488-00022-25.

a password protected internet site" which "has all Actos data from proposed clinical trials through published data (existing and planned) for both companies" and functions as "a new aid that effectively incorporates clinical data to communicate core messages to physicians."[76]

      **c.**     **Core Message: Focus on Glycemic Control Through Treatment of Insulin Resistance and Beta-Cell Preservation With Actos**

94.     In a 2000 Takeda/Lilly "Integrated Product Plan" document for the "ACTOS Product Team," the stated "Strategic Goals" of the alliance for the Actos/TZD class of drugs were to "'establish the class' by increasing awareness of insulin resistance in all … ACTOS markets," "'grow the class' by establishing TZDs as a class which has superior long-term efficacy and which is easier to use than other first-line … therapies for the treatment of Type 2 diabetes" and "'win the class' [by demonstrating] that ACTOS is the easiest to use within the class and has the most positive impact on lipid profile."[77] The "[i]ntended market position at end of period" was that Actos would "be the number one prescribed TZD in the US, as measured by prescriptions" because it is "the best insulin sensitivity enhancer because it delivers effective glycemic control. . ." Furthermore, Defendants foreshadowed the ACT NOW study, stating that "[b]y 2007, major clinical studies will demonstrate the continued safety of the TZDs" and "clinical studies will characterize the preservation of Beta-cell function with ACTOS (and other TZDs) leading to first line use, early in Type 2 diabetes."[78]

95.     Indeed, as these and other statements in the Takeda/Lilly "Integrated Product Plan" made clear in 2000, the role of Beta-cells in the delivery of "effective glycemic control" –

---

[76] *Id.*; P0488-00083.

[77] Ex. P6333-00002 to Jury Trial.

[78] *Id.* at P6333-00010.

a concept much broader than the basic treatment of insulin resistance in Type 2 diabetes – became the lynchpin of the entire Takeda/Lilly marketing strategy, which intended to "grow the class" by, among other things, planning and promoting – years in advance – foundational studies and marketing messages aimed at encouraging ever earlier "first line use" of TZDs in the service of glycemic control, including as it relates to the treatment of the underlying Beta-cell function. This growth strategy was best summarized in the planning documents under "Discussion of key internal events":

> If ACTOS can preserve Beta-cell function, the patient segments that might be started on a TZD will change and grow significantly so that earlier in the treatment cycle, a patient would be started on ACTOS *earlier in the treatment cycle*. […] Another consideration is whether *a campaign to increase awareness of those patients at risk for developing Type 2 diabetes* should be identified. The delineation between impaired glucose tolerance (IGT) and Type 2 diabetes should be communicated to *increase the number of patients seeking treatment*. A study on *prevention of Type 2 diabetes* will have to be considered.[79]

96. The planning documents surmise that "Demonstration of ACTOS' ability to preserve Beta-cell function longer will differentiate it from current oral anti-hyperglycemia medications" and, further, that synergies between Takeda and Lilly's respective clinical studies can be exploited in the service of establishing Actos' Beta-cell benefits: "[t]here is a possibility that the first year of Lilly's Beta-cell preservation trial (GLAG) can be combined with one of Takeda's European studies (gliclazide versus ACTOS)."[80]

97. Takeda and Lilly subsequently co-sponsored a large-scale survey of prescribing physicians' perceptions of Actos' efficacy, in the form of eight CME-like "market research meetings" conducted during October and November of 2001, with 350 "target" physicians in

---

[79] *Id.* at P6333-00011 (emphasis added).

[80] *Id.* at P6333-00025.

attendance. Speakers and a core set of presentation slides were all provided by Takeda/Lilly.[81] Among the core conclusions of the surveys of the participating target physicians were the fact that: "[p]articipants in all groups agree that ***insulin resistance is the primary or foundational defect in Type 2 diabetes***"; "[m]ost believe intuitively that TZDs preserve Beta cell function"; and "***[i]f convinced by clinical data that TZDs do, in fact, preserve Beta cells, many participants would feel compelled to use TZDs as 1st-line therapy***."[82]

98.     Hence, insulin resistance and Beta-cell preservation became the core marketing message for the Takeda/Lilly Actos alliance, as reflected in planning documents and presentations. In a presentation for a London Pharmaceutical Pipeline Event in 2005 sponsored by Takeda/Lilly, Dr. Spanheimer – a member of the Takeda speakers bureau – introduced a new framework for focusing Type 2 diabetes treatment on Beta-cell preservation, contrary to the prior practice of focusing solely on insulin resistance "in part because Beta cell fate has been viewed as unchangeable."[83] Dr. Spanheimer argued that Beta-cells are, in fact, highly plastic and capable of regeneration. He presented a chart entitled: "Nearly Half of Beta-Cell Function is Already Lost by the Time of T2DM Diagnosis – ***Window for Early Prevention***?" Dr. Spanheimer's "window," according to the chart, constitutes at least the 12 years prior to a given patient's actual diagnosis with Type 2 diabetes.[84]

99.     At or about the same time as the Spanheimer presentation, as the emergent data from the Takeda-sponsored PROactive study failed to produce the hoped for statistically

---

[81] Ex. P1181 to Jury Trial.

[82] *Id.* at P1181-00003 (emphasis added).

[83] Ex. P0542-00018 to Jury Trial.

[84] *Id.* at P0542-00020 (emphasis added).

significant positive results for Actos on cardiovascular safety and lipid benefits, an internal Takeda/Lilly planning document slide entitled "Landmark Scenario: Future Strategy" states that – given the insignificant PROactive results, which preclude the pursuit of a CV reduction messaging strategy or talk about lipid effects – the "focus would have to be on Glycemic control" – the "medium term after damage limitation *the strategy would have to shift towards Beta-cell preservation*."[85] Further, the intention of the Takeda/Lilly alliance to promote Actos for prediabetes/prevention is evidenced in a slide in the same presentation entitled "Paradigm Shift: Outstanding Questions?," the question is posed: "Should pioglitazone be the first choice for oral *anti-diabetic* agents?"[86]

100.    Notwithstanding PROactive's failed results, Takeda issued a misleading press release on November 16, 2005, stating, among other things, that PROactive data "shows Takeda's Actos reduced heart attacks by 28 percent in people with Type 2 diabetes" while including only one qualifying statement in the multi-page press release that "[a]s reported at the EASD annual meeting in September of '05, the primary endpoint was reduced by 10 percent but had not reached statistical significance by study end."[87]

101.    Takeda defended the nightmare scenario of the PROactive study results by excluding data and cherry-picking favorable secondary data endpoints for the reports that were submitted to journals for publication.[88] Accordingly, the American Heart Association Journal

---

[85] Ex. P0105-00022 to Jury Trial (emphasis added).

[86] *Id.* at P0105-00032 (emphasis added).

[87] Jury Trial Transcript at 3761-62, Vol. XXV.

[88] *Id.* at 3773.

rejected the publication for these reasons.[89]  Peer review comments from the Lancet committee, which also rejected the PROactive report – despite having published the original PROactive paper – detailed numerous shortcomings of the report, including: "[t]his looks like an extremely audacious attempt to massage the PROactive study data for further 'significant' results"; "[t]he study design of this post-hoc analysis is seriously flawed and reflects a considerable degree of bias, some of which may have commercial implications"; "[t]he trial itself had mixed results and has been marketed with considerable hyperbole despite much criticism of the analysis and conclusions"; "[t]he authors now focus on the group with previous heart attack, or myocardial infarction. Again, there is much confusion as to what was or was not prescribed as an endpoint. The authors seem to have cherry-picked the endpoint to come up with a positive result"; and, "[m]ost disturbing is the fact that in their composite of significant cardiac events they have left out congestive heart failure."[90]

102.    Similarly, a September, 2007 mass mailing from Dr. Spanheimer, presumably to physician "contacts" from Takeda speakers bureau events, gave a misleadingly positive interpretation of the PROactive study results: "[t]he analysis showed that ACTOS was associated with a significantly lower risk of heart attack, stroke, or death among a diverse population of patients with Type 2 diabetes relative to control therapy."[91]

103.    As was demonstrated by the Takeda/Lilly alliance's subsequent campaigns, the core marketing message became the use of Actos to treat the broader glycemic conditions of insulin resistance and associated Beta-cell deterioration – conditions that occur both before and

---

[89] Exs. P3547 & P5010 to Jury Trial.

[90] Ex. P0550 to Jury Trial.

[91] Ex. P2034 to Jury Trial.

after the official onset of Type 2 diabetes – as a means of promoting the ever earlier and prediabetic applications of Actos amongst prescribing physicians. As the 2005 internal planning slides indicate, Takeda/Lilly's strategy was to "support global efforts to **expand indicated use for** ACTOS" by "Building the Foundation – **Influencing the influencers**."[92] The influencing of influencers strategy involved hiring of KOLs to speak and author publications, drawing on Takeda/Lilly-produced presentations and/or ghostwritten publications, to influence respected medical publications, such as the New England Journal of Medicine as well as trusted diabetes-focused institutions, such as the ADA, The American Association of Clinical Endocrinologists (AACE) and The American College of Endocrinology (ACE), to promote the off-label use of Actos for the treatment of patients with IGT/prediabetes.

### d. Defendants Marketed the Core Message To Doctors

104. The Actos Trial exhibits reveal numerous examples of the Takeda/Lilly sales force directly promoting ever earlier and/or prediabetes/preventive off-label applications of Actos.

105. In a July 6, 2006 sales call entry – after the misleading PROactive press release was issued – regarding a visit to Dr. Elisabeth C. Zausmer and apparently a group of other doctors, Gigi Chen, a Takeda sales representative reports: "[f]ound out [the doctor] is an endo. Able to go through entire detail aid for all doctors present. Good questions and Actos well received. Discussed **prediagnosis of up to 15 years** and **the need to treat as early as possible to address core defects**. Doctors all agreed and said made sense. Discussed PROactive and **lipid benefits**."[93] In this sales call, not only did Chen promote lipid benefits, despite not being

---

[92] Ex. P0488-00013 to Jury Trial (emphasis added).

[93] Ex. P7131-00004 to Jury Trial (emphasis added).

allowed to promote them on the basis of the inconclusive PROactive results, but Chen also apparently promotes the idea of "prediagnosis" for up to 15 years before diabetes onset and the "need to treat as early as possible to address core defects."  The most reasonable interpretation of these comments is that Chen – and presumably other members of the Actos sales team under her authority – was promoting off-label Actos treatment of prediabetic symptoms.  Chen pushed for early use of Actos, using the same "core defects" justifications (*e.g.*, insulin resistance, Beta-cell preservation) that Dr. DeFronzo would employ in June 2008 in his Banting Lecture (discussed below), and which was an iteration of the core Takeda/Lilly Actos message justifying prediabetes applications for Actos.

106.    In other examples, in a May 27, 2005 sales visit – shortly after the release of PROactive data – by Chen to physician Dawn A. Gais, Chen reported in the log: "ACTOS: A/R: was able to hit her with new data. She wanted to know if we had any info to send to an HMO re: ***non-diabetic w/IR*** which would allow her to put pt on actos."[94]  In other words, Chen's reporting of the new PROactive data, among other things, convinced Dr. Gais – on the basis of "IR," meaning insulin resistance – that prescribing Actos in a prediabetic patient was both appropriate and advisable.

107.    In an October 27, 2005 sales visit to Dr. Michele A. Matala, Chen again pushed for earlier use of Actos, reporting: "F: use IDC w/ her to show ***earlier usage of actos benefits her diabetic pts***."[95]

108.    In a February 6, 2006 sales visit to Dr. Patricia Parysek, Chen pushed for earlier use of Actos, reporting: "ACTOS: A/R: Discussed benefits of ***using as early as possible***."[96]

---

[94] *Id. at* P7131-00001.

[95] *Id.* at P7131-00003.

109.    In a February 10, 2006 sales visit to Dr. Branko G. Karakas, Chen made the prediabetes message even more explicit, reporting: "ACTOS: A/R: gave him his book. He was the most talkative person today. very friendly. I asked if I could just leave him w/ one thought about actos before I left the territory….showed him ***import of treating diabetes before it was diagnosed***."[97]

110.    In an April 17, 2006 sales visit entry by Takeda sales representative Doug Goeckel to physician John Reilly stated: "reinforce benefits and grow use ACTOS: a/r: ***went over early treatment with tzd's*** and why actos is the better choice. reminded him of fomulary coverage and actos rebate program. he uses 3rd line but said he has started to bring tzd's in early f: ***continue to push benefits of early treatment***."[98]

111.    These are just examples of Takeda's off-label marketing of Actos for prediabetes. These examples come from the 2014 Actos Trial that was not itself about off-label marketing of this sort.  More examples of this sort should become available with discovery.

### e.    Dr. DeFronzo: Primary Takeda KOL While Working to Give the False Impression of Clinical Bases for Off-Label Use of Actos

112.    The primary thought leader for Takeda's scheme to market Actos for the treatment of prediabetes was Dr. Ralph DeFronzo, a leading expert in diabetes research. According to a biography distributed by Takeda:

> Ralph A. DeFronzo, MD, is Professor of Medicine and Chief of the Diabetes Division at the University of Texas Health Science Center and the Audie L. Murphy Memorial VA Hospital in San Antonio, Texas.  Dr. DeFronzo is a graduate of Harvard Medical

---

[96] *Id.*

[97] *Id.*

[98] Ex. P7161-00004 to Jury Trial.

School and did his training in Internal Medicine at the Johns Hopkins Hospital…His major interests focus on the pathogenesis and treatment of Type 2 diabetes mellitus and the central role of insulin resistance in the metabolic-cardiovascular cluster of disorders known collectively as the Insulin Resistance Syndrome… Dr. DeFronzo has helped to define the biochemical and molecular disturbances responsible for insulin resistance in Type 2 diabetes mellitus.[99]

113.    Dr. DeFronzo had served on the ADA Expert Committee in 1997 and 2003 and, in that capacity, materially influenced the Committee's decisions to lower the ADA's FPG standards for diabetes and prediabetes.  Dr. DeFronzo was a paid Takeda consultant and/or member of Takeda's speakers bureau at the time of both of those decisions by the ADA Expert Committee.

114.    Dr. DeFronzo's role as Takeda's Actos thought leader continued when Takeda paid him, in or about 2007, to sign on as the lead author of the Takeda-developed, funded and initiated ACT NOW study, which provided the clinical data to support Takeda's off-label messaging campaign by producing data supporting the claim that Actos prevents and/or delays the onset of diabetes in patients with IGT.  The ACT NOW study listed numerous paid "authors," who were also paid members of Takeda's speakers bureau and/or advisory panel and who would continue on to join Takeda's wider global network of paid KOLs to further promote Actos for off-label uses unapproved by the FDA – drawing on ACT NOW study results – through a sophisticated campaign of published articles, industry awards, lecture presentations, and reports of the ACT NOW study.  These paid KOLs often presented this marketing material under the auspices of the ADA, the AACE or the ACE, to whom Takeda had made significant monetary contributions in order to obtain access for its marketing scheme.

---

[99] *Ralph Anthony DeFronzo, MD – Biography*, Diabetes Dialogue, http://www.diabetesdialogue.com/defronzo_bio.html (last visited Mar. 26, 2012).

115.     In conjunction with his work with the ACT NOW study, Dr. DeFronzo acted as a primary KOL/spokesperson to codify and promote the underlying clinical rationale for expanding the use of Actos into off-label/preventive prediabetes applications, namely, the rooting of all diabetes progression in insulin resistance and the requisite Beta-cell deterioration. Arguably, the "kickoff" performance in this role came with Dr. DeFronzo's widely cited delivery of the Banting Lecture at the ADA's 68th Scientific Session in June of 2008, detailed herein *infra*. Dr. DeFronzo, in his immediate introductory statements, lays out a "treatment paradigm shift" in treating the "core pathophysiologic defects" of insulin resistance and Beta-cell failure in those with IGT/prediabetes that "must be started early" (i.e., during IGT, prior to the onset of clinical diabetes):

> Insulin resistance in muscle and liver and Beta-cell failure represent the core pathophysiologic defects in Type 2 diabetes. It now is recognized that ***the Beta-cell failure occurs much earlier and is more severe than previously thought***. Subjects in the upper tertile of impaired glucose tolerance (IGT) are maximally/near-maximally insulin resistant and have lost over 80% of their Beta-cell function. In addition to the muscle, liver, and Beta-cell (triumvirate), the fat cell (accelerated lipolysis), gastrointestinal tract (incretin deficiency/resistance), Beta-cell (hyperglucagonemia), kidney (increased glucose reabsorption), and brain (insulin resistance) all play important roles in the development of glucose intolerance in Type 2 diabetic individuals. Collectively, these eight players comprise the ominous octet and dictate that: 1) multiple drugs used in combination will be required to correct the multiple pathophysiological defects, 2) treatment should be based upon reversal of known pathogenic abnormalities and not simply on reducing the A1C, and 3) ***therapy must be started early to prevent/slow the progressive Beta-cell failure that already is well established in IGT subjects***. A treatment paradigm shift is recommended in which combination therapy is initiated with diet/exercise, metformin (which improves insulin sensitivity and has antiatherogenic effects), ***a thiazolidinedione (TZD) (which improves insulin sensitivity, preserves Beta-cell function, and***

*exerts antiatherogenic effects*), and exenatide (which preserves Beta-cell function and promotes weight loss).[100]

116.    As detailed further herein, Dr. DeFronzo's Banting Lecture – together with the supporting data that would be produced by the ACT NOW study – provided the framework from which Dr. DeFronzo and scores of other Takeda-financed KOLs would draw quasi-scientific support for their promotion – in speeches and/or publications – of the off-label benefits of Actos for IGT and diabetes prevention.

117.    For example, in May 2011 *Diabetes Care* article titled "Type 2 Diabetes Can Be Prevented With Early Pharmacological Intervention," Dr. DeFronzo explicitly recommends the use of the active ingredient in Actos, pioglitazone, for preventing the onset of Type 2 Diabetes. After discussing behavioral treatment and other pharmacological solutions, Dr. DeFronzo wrote, "we believe that low-dose pioglitazone (15-30 mg/day) combined with low-dose metformin (1,000 mg/day) would be the preferred choice for treatment of IGT."[101]    Notably, Dr. DeFronzo did not disclose the research he conducted for the drug's manufacturer.  Appearing at the end of the piece is the demonstrably incorrect statement that: "No potential conflicts of interest relevant to this article were reported."

118.    Previous to this publication in May 2011, Dr. DeFronzo produced at least three articles promoting the use of Actos or TZDs to treat prediabetes.  In each one of these articles, his affiliation with Takeda Pharmaceuticals was stated but he did not reveal the amount Takeda had paid him and the context.

---

[100] *See* DeFronzo, Banting Lecture, *supra* n.4, 58 Diabetes at 773 (emphasis added).

[101] Ralph A. DeFronzo & Muhammad Abdul-Ghani, *Type 2 Diabetes Can Be Prevented With Early Pharmacological Intervention*, 34 Diabetes Care S202, S207 (2011).

119.     The 2007 ADA Consensus Statement, published in *Diabetes Care* showed panel

member's affiliations with pharmaceutical companies.  From the statement, it can be seen that Dr.

DeFronzo received research support from Takeda and served as a member on Takeda's speakers

bureau and advisory panel.  Other researchers had affiliations with Takeda.  Dr. Robert R. Henry

received research support from Takeda and served as a member on Takeda's speakers bureau and

advisory panel.  Dr. Richard Pratley received research support from Takeda and served as a

consultant for Takeda.[102]

120.     Takeda paid Dr. DeFronzo and other KOLs to sign on as co-authors on the ACT

NOW study – compensating them directly and/or indirectly with research grant support and/or

hiring them as paid consultants and/or onto Takeda's speakers bureau:  Dr. DeFronzo was on

Takeda's advisory board, speakers bureau, served as a consultant for Takeda and received grant

support from Takeda; Dr. Henry was a consultant for Takeda; Dr. MaryAnn Banerji was on the

Takeda speakers bureau and received research grants from Takeda; Robert Ratner had grant

support from Takeda and was on Takeda's advisory board; Abbas E. Kitabchi was a member of

the Takeda speakers bureau and received grant support from Takeda; Dawn Schwenke and

Devjit Tripathy both received grant support from Takeda; Dr. Buchanan was a member of the

Takeda speakers bureau and advisory board and received grant support from Takeda; Peter D.

Reaven was a member of the Takeda speakers bureau and received grant support from Takeda.[103]

Thus, the authors of the ACT NOW study had conflicts of interest.

121.     The ACT NOW study was designed, planned, and funded by Takeda with the

very same strategic arguments – for the aggressive promotion of Actos as a means of glycemic

---

[102] *See* 2007 ADA Consensus Statement, *supra* n.41, 30 Diabetes Care at 757.

[103] DeFronzo, ACT NOW study, *supra* n.42, 9 BMC Endocrine Disorders at 7-8.

control through the pursuit of Beta-cell preservation – detailed in the 2000 Takeda/Lilly Integrated Product Plan internal document.  As noted in the internal document, Defendants' "intended market position" was that "[b]y 2007, major clinical studies will demonstrate the continued safety of the TZDs" and "clinical studies will characterize the preservation of Beta-cell function with ACTOS (and other TZDs) leading to first line use, early in Type 2 diabetes."[104]  However, the ACT NOW study falsely stated that:

> This study was initially designed by RAD [Ralph A. DeFronzo] and subsequently critiqued by all authors. The study then was submitted to Takeda Pharmaceuticals NA and funded as an investigator-initiated grant. TPNA was not involved in the study design, study performance, data analyses, or manuscript preparation. At each study site, the investigators were responsible for patient recruitment and performance of all study-related procedures. All authors read and approved the final version of the manuscript.[105]

122.    Additionally, the New England Journal of Medicine showed that the 2011 Dr. DeFronzo study was supported by Takeda Pharmaceuticals and detailed at least some of each author's potential conflicts of interest.[106]  Dr. DeFronzo reported receiving payments for board membership from Takeda and reported that his teaching institution, the University of Texas Health Science Center at San Antonio, received grant support from Takeda.  Other researchers disclosed affiliations with Takeda:  Dr. Buchanan reported receiving consulting fees and lecture fees from Takeda and reported that the University of Southern California Keck School of

---

[104] Ex. P6333-00010 to Jury Trial.

[105] DeFronzo, ACT NOW study, *supra* n.42, 9 BMC Endocrine Disorders at 7.

[106] *See* Ralph A. DeFronzo *et al.*, *Pioglitazone for Diabetes Prevention in Impaired Glucose Tolerance*, 364 New Eng. J. Med. 1104, 1113-14 (2011), http://www.nejm.org/doi/pdf/10.1056/NEJMoa1010949 (last visited Oct. 14, 2014).

Medicine has received grant support from Takeda; Dr. Henry reported receiving consulting fees, lecture fees, and payment for expert testimony from Takeda; Dr. Musi reported receiving consulting fees from Takeda; Dr. Tripathy reported receiving grant support from Takeda. Disclosure forms were provided by the authors and made available online.

123.     However, even beyond Dr. DeFronzo's failure to disclose his financial relationship with Takeda in the May 2011 *Diabetes Care* article, there are several problems with the article itself and its recommendations.   For one, to support his recommendations, Dr. DeFronzo cited the effectiveness of pioglitazone in preventing diabetes as shown in the ACT NOW study, a study that Takeda planned and funded and for which DeFronzo, as the nominal "author," received substantial remuneration from Takeda.   For another, in the *Diabetes Care* article, Dr. DeFronzo recommended a lower dose of pioglitazone than was actually used in the ACT NOW study.   As the article explained: "[a]lthough the pioglitazone dose in ACT NOW was 45 mg/day, lower doses (15-30mg/day) improve insulin sensitivity and insulin secretion (160a) in Type 2 diabetes and were effective in decreasing IGT conversion to Type 2 diabetes and in reverting IGT to NGT in ACT NOW."[107]   The critical point here is that the ACT NOW study did not test pioglitazone dosages as low as 15 mg/day.   The lowest dosage administered in the study was 30mg/day.   The data from a 2002 study he conducted[108] did show that doses as low as 15mg/day improved insulin sensitivity and insulin secretion in patients with Type 2 Diabetes, but it did not observe this effect in patients with IGT.   Therefore, Dr. DeFronzo recommended a dosage range for pioglitazone (15mg/day-29mg/day) meant to "decreas[e] IGT conversion to

---

[107] *See* DeFronzo & Abdul-Ghani, *supra* n.101, 34 Diabetes Care at S205.

[108] Yoshinori Miyazaki *et al.*, *Dose–Response Effect of Pioglitazone on Insulin Sensitivity and Insulin Secretion in Type 2 Diabetes Mellitus*, 25 Diabetes Care 517 (2002).

Type 2 diabetes and [] revert[] IGT to NGT" that he had not clinically tested and for which there were no clinical results. The FDA recognized the importance of clinically investigating varying dosages when it gave Takeda over 29 months to design, conduct, and report back on a 6-month study comparing the safety and efficacy of Actos 30 mg versus Actos 45 mg, before granting final approval for the drug.[109]

124. Dr. DeFronzo also stated that the lower doses had been associated with less weight gain and fluid retention in supplemental data he provided, and that low doses of rosiglitazone in a test of Canadians with IGT showed similar results. However, the drug the Canadian study tested, rosiglitazone, was explicitly called out in the 2007 ADA Consensus Statement as causing a sevenfold increase in heart failure.[110]

125. Takeda and Dr. DeFronzo purposely sidestepped the weight gain and fluid retention that was observed in the ACT NOW study by recommending a lower dosage of the drug. No one had tested this dosage on patients to see if it prevented the conversion from IGT to Type 2 diabetes. Dr. DeFronzo and Takeda did so in the service of continued marketing of Actos for the off-label treatment of prediabetes.

126. Dr. DeFronzo claimed that "because of weight gain, fluid retention, and fractures […], the [2007 ADA Consensus Statement] did not recommend thiazolidinediones for treating IGT/IFG,"[111] but did not mention that TZDs have also been associated with an increased occurrence of cardiovascular events. In fact, the 2007 ADA Consensus Statement cited by Dr. DeFronzo made one mention of TZDs, and it was to a specific member of the class, not the class

---

[109] Letter from John K. Jenkins, *supra* n.26.

[110] *See* 2007 ADA Consensus Statement, *supra* n.41, 30 Diabetes Care at 757.

[111] *See* DeFronzo, *supra* n.101, 34 Diabetes Care at S205.

itself.[112]   More importantly, the 2007 ADA Consensus Statement dismissed the use of thiazolidinediones not because of weight gain, fluid retention, and fractures, as Dr. DeFronzo claimed, but instead for increased cardiac risks.  The 2007 ADA Consensus Statement reads, "[r]osiglitazone is costly and was associated with a sevenfold increase in heart failure, although the number of such cases was small."[113]  DeFronzo misconstrued the ADA's own words in the 2007 ADA Consensus Statement and thereby conveniently avoided discussing the cardiac risks of taking Actos.

127.   As expressed in the 2007 ADA Consensus Statement that Dr. DeFronzo co-authored, "[o]ne of the other major reasons to recommend therapeutic interventions for individuals with IFG/IGT is the potential to reduce the long-term increased risk of CVD [cardiovascular disease] associated with diabetes."[114]  However, weight gain and edema increase risk of heart cardiovascular disease.  Physicians are constantly assessing benefits against risk when prescribing medication.  For individuals who already have Type 2 diabetes, it might make sense to accept the weight gain, edema, and increased risk for CVD.  These patients are already at a significantly higher risk for CVD due to the benefit of lowered blood glucose from their dangerously high levels.  Patients with IGT, however, do not necessarily have the increased risk for CVD that diabetics do.  Taking Actos as a prediabetic potentially brings that patient closer to the CVD he seeks to prevent.  Takeda and Dr. DeFronzo advocated for prediabetics to take Actos, and downplayed the risks.

---

[112] *See*, *generally*, 2007 ADA Consensus Statement, *supra* n.41, 30 Diabetes Care at 753.

[113] *Id.* at 757.

[114] *Id.* at 755.

128.    Dr. DeFronzo also promoted pioglitazone in another study in May 2012.  Dr. DeFronzo co-authored another prediabetes study testing the effects of combinations of insulin sensitizers (pioglitazone + metformin) on insulin resistance and impaired Beta-cell function, in an attempt, following the ACT NOW study publication, to promote the "successful treatment of prediabetes in clinical practice."[115]  On information and belief, the study was funded with support from Takeda, although it was not disclosed therein.  The study concluded that "targeted pathophysiologic therapy" using insulin sensitizers (including pioglitazone) as directed in the study was "safe" and "is associated with marked improvement in glucose tolerance and reversion of prediabetes to normal glucose tolerance in more than 50% of patients."[116]  Thus, Dr. DeFronzo continued to promote off-label clinical uses for pioglitazone in the absence of FDA approval for such therapies.

129.    Through the primary influence of Dr. DeFronzo and the ACT NOW study results, Dr. DeFronzo and many of the aforementioned KOLs/co-authors of the ACT NOW study continued to promote the benefits of Actos for off-label IGT/diabetes prevention uses in interviews, publications, in speeches, at CME conferences/programs, and through leadership roles at respected institutions like the ADA, AACE and ACE.  In addition to the ACT NOW co-authors, Takeda hired as many as a thousand KOLs globally to serve on Takeda's speakers bureau, in which capacity the KOLs were paid to give speeches and presentations extolling the virtues of the off-label use of Actos for IGT/diabetes prevention.  Through these mechanisms, not only was Takeda able to attach their product to the first mention of prediabetes treatment

---

[115] John Armato *et al.*, *Successful Treatment of Prediabetes in Clinical Practice: Targeting Insulin Resistance and Beta-Cell Dysfunction*, 18 Endocr. Pract. 342 (2012).

[116] *Id.* at 342.

throughout the community, but it was able to influence the entire dialogue and tone of the discussion on prediabetes.

### f.   Dr. DeFronzo's Further Promotion of Actos for Prediabetes

130.   Dr. DeFronzo exploited the respect afforded him by the medical community in order to promote Actos as a treatment option for prediabetes.  He is the head of the Texas Diabetes Institute ("TDI") at 701 S. Zarzamora, San Antonio, TX 78207.  The TDI website advertises the clinic as "one the nation's largest and most comprehensive centers entirely dedicated to diabetes prevention, treatment, education, research and the relentless search for a cure."[117]

131.   He was given various opportunities to speak publicly as an expert in the field of diabetes research, and he used these opportunities to further the marketing agenda of Takeda Pharmaceutical and obtain lucrative "consulting" fees.  Among other opportunities:  (1) Dr. DeFronzo received the Claude Bernard Award from the European Association for the Study of Diabetes in September of 2008 and presented on the ACT NOW study;[118] (2) Dr. DeFronzo spoke at the Endocrine Society of Australia (ESA) & Society for Reproductive Biology (SRB) Annual Scientific Meeting Aug. 29 – Sept. 1, 2010;[119] (3) Dr. DeFronzo gave the Philip Bondy

---

[117] *Texas Diabetes Institute,* University Health System, http://www.universityhealthsystem.com/texas-diabetes-institute/ (last visited Oct. 8, 2014).

[118] News Release, The University of Texas Health Science Center at San Antonio, San Antonio researcher receives top American diabetes award (June 12, 2008), http://uthscsa.edu/hscnews/singleformat2.asp?newID=2774 (last visited Oct. 14, 2014).

[119] *Endocrine Society of Australia and Society for Reproductive Biology Annual Scientific Meeting*, University of Sydney, http://sydney.edu.au/news/medicine/542.html?eventid=6312 (last visited Oct. 14, 2014).

Lecture at Yale University in 2008;[120] and (4) Dr. DeFronzo spoke while receiving the Italian Diabetes Society Mentor Prize Award.[121]

132.    In a report on a May 2, 2013 AACE Meeting, Dr. DeFronzo stated that "***he uses TZDs in his patients***, he said he believes the use of incretin hormones will increase going forward."[122]

133.    Dr. DeFronzo's lectures all served to further Takeda's strategy to market Actos off-label for the condition of prediabetes.  All lectures discussed Actos and/or presented Dr. DeFronzo's Actos-related work.

      g.      **Other KOLs on Takeda's Payroll Echoed DeFronzo's Messaging and Themselves Prescribed Actos Off-Label for the Treatment of IGT and Prediabetes**

134.    Reporting on DeFronzo's delivery of the Banting Lecture in 2008 at the ADA's 68th Scientific Session, journalist Theresa Garnero, APRN, BC-ADM, MSN, CDE, gushed about DeFronzo's lecture recommending aggressive prediabetes treatments, including the use of TZDs to stave off Beta-cell deterioration:

> [DeFronzo] laid the groundwork for hitting diabetes hard and fast with the three medications that are known to address the physiologic deficits: metformin (Glucophage), thiazolidinediones (Actos or Avandia), and the incretin mimetic GLP-1, exenetide

---

[120] December 2008 – Yale Department of Internal Medicine Conference Schedule (Dec. 2, 2008), https://medicine.yale.edu/intmed/news/calendars/33142_12-2008ConfSchedule.pdf  (lasted visited Oct. 14, 2014).

[121] *See* Defronzo Biography, *supra* n.99.

[122] *AACE: Ralph A. DeFronzo, MD – Diabetes Prevention Supports More Aggressive and Earlier Intervention,* Diabetes in Control (May 2, 2013) http://www.diabetesincontrol.com/articles/53-/14600-aace-ralph-a-defronzo-md-diabetes-prevention-supports-more-aggressive-and-earlier-intervention (last visited Oct. 14, 2014) (emphasis added).

(Byetta). That's in addition to lifestyle modification […] He doesn't present himself as a rebel, even though his lecture was somewhat scandalous (who else could categorically refute ADA recommendations?). He's a passionate researcher and a personable genius. Dr. [De]Fronzo received thunderous applause and a well-deserved standing ovation. This was a historic lecture that will have ripple effects for years to come. The bottom line is to take action. Don't wait — protect your remaining Beta cells. Exercise if you can. Talk with your healthcare team about what changes should be made. Thank you, Dr. DeFronzo.[123]

135.    Other sources reveal Ms. Garnero to be a member of the AADE (American Association of Diabetes Educators) Board of Directors, which, in its 2009 Annual Report, disclosed "productive relationships with members of our Industry Allies Council" which included, among others, Takeda.[124]

136.    Dr. Buchanan, who co-authored the TRIPOD, PIPOD and ACT NOW studies, in reporting on the TRIPOD study in 2005, was also an early promoter of the use of TZDs for diabetes prevention:

This line of research is leading to a rational approach to diabetes prevention and early treatment […] Patients at increased risk for Type 2 diabetes should exercise and keep their weight as close to normal as possible. They should have regular check-ups to see if their glucose levels are stable, which means they are not progressing toward diabetes, or rising, which means they are progressing. If they continue to worsen, despite weight control and

---

[123] Theresa Garnero, *DeFronzo Dethrones ADA Protocol for Type 2 Diabetes*, Diabetes Life (May 17, 2013), http://www.dlife.com/diabetes/type-2/diabetes-causes/garnero_0608 (last visited Oct. 14, 2014).

[124] American Association of Diabetes Educators, *AADE 2009 Annual Report*, at 6, https://www.diabeteseducator.org/export/sites/aade/_resources/pdf/general/Annual_Report_Final.pdf (last visited Oct. 14, 2014).

exercise, ***medications such as pioglitazone can be used to slow or stop their progression to diabetes***.[125]

137.    Dr. MaryAnn Banerji, who was a co-author of the ACT NOW study, served as the co-lead faculty in a CME program on November 12, 2009, entitled "Slowing the Progression of Type 2 Diabetes: Early Intervention in the Primary Care Setting," in which she gave a presentation which discussed, among other things, the use of TZDs in the prevention of prediabetes and listed pioglitazone/Actos as one of the options to choose from.  The program brochure disclosed that Dr. Banerji received grants/research support from Takeda Pharmaceuticals Inc.[126]

138.    Dr. Banerji also organized a symposium on September 15, 2009 at The New York Academy of Sciences Conference Center in New York, NY entitled "Type 2 Diabetes Disparities in Ethnic Minorities: Origin, Challenges and Solutions," wherein her receipt of research support from Takeda was disclosed, as was the membership of another presenter at the Symposium – Dr. Cary S. Pollack of The Mount Sinai School of Medicine – in Takeda's Speaker's Bureau.  Dr. Pollack presented on the topic of "Comorbidity of Diabetes with Cardiovascular Syndromes," in

---

[125] University of Southern California, *Lowering Resistance To Insulin May Delay Or Prevent Onset Of Type 2 Diabetes,* ScienceDaily (June 12, 2005), http://www.sciencedaily.com/releases/2005/06/050612110652.htm (last visited Oct. 14, 2014) (emphasis added).

[126] *Slowing the Progression on Type 2 Diabetes,* Pri–Med Institute (Nov. 12, 2009), http://www.pri-med.com/PMO/DigitalAssets/Shared%20Files/Syllabus%20Files%20Fall%202009/C&E/East/Pre-Con/Track%202-Session%205-Diabetes-Pri-Med-East-ONLINE.pdf (last visited Oct. 14, 2014).

which it was disclosed that "Dr. Pollack intends to discuss **unlabeled** uses of Actos (pioglitazone HCl), provided by Takeda Pharmaceuticals."[127]

139.    In a July 20, 2010 article, the *Wall Street Journal* disclosed that Dr. Abraham Thomas, who had been one of the 12 ADA committee members who voted for the withdrawal of Avandia, admitted to having given two Takeda-sponsored talks about Actos between September 2007 and September 2008.[128]

140.    In an April 2011 blog post, Dr. Matthew Mintz, Associate Professor of Medicine at the George Washington University Medical Center in Washington, DC and primary care physician, discussed the study "Pioglitazone for Diabetes Prevention in Impaired Glucose Tolerance," which was co-authored by Dr. DeFronzo and published in the March 24, 2011 issue of The New England Journal of Medicine.[129]    In a blog post titled "Using Actos to Prevent Diabetes," Dr. Mintz wrote that, in light of this study, "[f]or all patients, diet and exercise is clearly the first step and always encouraged at every step" and recommended prescribing Actos for prediabetes/IGT, arguing that: "[p]ioglitazone has demonstrated that it can effectively prevent

---

[127] *See Type 2 Diabetes Disparities in Ethnic Minorities: Origin, Challenges and Solutions*, The New York Academy of Sciences, http://www.nyas.org/Events/Detail.aspx?cid=0ef4bccc-0ee7-424e-a59a-7f7e5b3e726e (follow "Final Program" hyperlink) (last visited Oct. 14, 2014) (emphasis added).

[128] Michael O'Riordan, *News Report Links Avandia Panelists to Drug Makers*, Medscape (July 21, 2010), http://www.medscape.com/viewarticle/725540 (last visited Oct. 14, 2014).

[129] *See* DeFronzo, *supra* n.106, 364 New Eng. J. Med. 1104.

diabetes in most patients with known but manageable side effects, and therefore should be considered a useful tool."[130]

141. Two months later, in a June 2011 blog post, Dr. Mintz analyzed the emerging data on CV and bladder cancer risks of Avandia versus those in Actos, ultimately suggesting that, on the available evidence, Avandia may be a safer choice than Actos in terms of the relative risk of bladder cancer, but didn't rule out the use of either drug.[131] Dr. Mintz is an advocate of the TZD class and he, like other doctors, has prescribed Actos. He responded to comments to his blog post and asserted that: "The TZD class (Actos and Avandia) is an important class because it is the only diabetes medication to show long, sustained diabetes control." He further contends, without basis, that the health risks of these drugs do not outweigh their benefits for people with prediabetes.[132] At the time of writing, Dr. Mintz was a member of the Takeda speakers bureau.[133]

142. In an August 2014 interview, Dr. Mintz expressed agreement with and reliance upon the studies by Dr. DeFronzo and others favoring the use of TZDs for diabetes prevention. When asked if he "fall[s] into a camp that would say that pioglitazone (or Actos) is a viable drug for the use with people with … elevated [blood] sugar levels, but not necessarily Type 2

---

[130] Matthew Mintz, *Using Actos to Prevent Diabetes,* Dr. Mintz' Blog (Apr. 1, 2011, 8:32 AM) http://drmintz.blogspot.com/2011/04/using-actos-to-prevent-diabetes.html (last visited Oct. 14, 2014).

[131] Matthew Mintz, *Actos Causes Bladder Cancer. Maybe We Should Have Kept Avandia?* Dr. Mintz' Blog, (June 11, 2011, 8:52 AM), http://drmintz.blogspot.com/2011/06/actos-causes-bladder-cancer-maybe-we.html (last visited Oct. 14, 2014).

[132] *Id.*

[133] *Disclosures*, Dr. Mintz' Blog, http://drmintz.blogspot.com/p/disclosures.html (last visited Oct. 14, 2014).

diabetics, technically," he replied "that's correct." When asked if the basis for this belief is the research of Dr. DeFronzo, which asserts that there "may be benefits … that prevent the onset of Type 2 diabetes," Dr. Mintz again replied "that's correct." When asked "what sort of impact that" Dr. DeFronzo's research and the general viewpoint favoring the use of Actos and other TZDs in diabetes prevention "has on actual clinical practice" Dr. Mintz replied: "if you are asking about my practice the answer is it has *a ton* of effect on what I do" (emphasis added).

143. In September of 2010, Dr. John Leahy – a Professor of Medicine and Chief of the Division of Endocrinology, Diabetes and Metabolism at the University of Vermont College of Medicine and recipient of a Takeda research grant from September 1, 2010 through February 25, 2013 – became a founding member of BetaCellsinDiabetes.org,[134] an online resource established in connection with The Endocrine Society and with contributions from Lilly with the stated mission to:

> [e]ngage primary care physicians in pathophysiology-based clinical decision making through an interactive educational format that stimulates debate and ***encourages physicians to incorporate the new science into their treatment regimens for patients with Type 2 diabetes***. [and bring] together basic researchers, clinical endocrinologists, and primary care physicians (PCPs) to discuss ***the need to improve understanding of the role of Beta cells as key drivers in the natural history of T2DM [with the hope] that this effort will aid primary care physicians in the interpretation of concepts of disease pathogenesis***, such as Beta cell dysfunction, and improve medical decision-making in T2DM.[135]

---

[134] *Chair page: - Events - University of Vermont,* Yumpu, https://www.yumpu.com/en/document/view/5140081/chair-page-events-university-of-vermont/61 (last visited Oct. 7, 2014).

[135] *Mission Statement,* BetaCellsinDiabetes, http://www.Betacellsindiabetes.org/about (last visited Oct. 14, 2014) (emphasis added).

144.    Since 2010, Dr. Leahy has published numerous articles promoting this agenda to a PCP audience, including a BetacellsinDiabetes.org "Consensus Statement" entitled "Targeting Beta-Cell Function Early in the Course of Therapy for Type 2 Diabetes Mellitus."[136] Citing to the DREAM, ACT NOW and TRIPOD studies, the Statement argues that the process of "[d]eclining Beta-cell function in the presence of increasing hyperglycemia and relatively constant insulin resistance characterizes the pathogenesis of T2DM" and "begins early in [T2DM's] natural history, accelerates markedly after reaching a compensatory threshold, drives the progression of the disease, and is potentially reversible, particularly in the early stages […] new evidence suggests that early intervention to improve metabolic control may improve Beta-cell function."[137]    The Statement's "Implications for Treatment" – citing directly to Dr. DeFronzo's Banting Lecture – recommends that the fact that "Beta-cell failure occurs much earlier and severely than commonly believed suggests that regular glycemia screening and identification of patients at metabolic risk, as well as prompt and aggressive intervention to stem the cumulative deleterious effects of chronic hyperglycemia on Beta-cell function, deserves

---

[136] Jack L. Leahy *et al.*, *Targeting Beta-Cell Function Early in the Course of Therapy for Type 2 Diabetes Mellitus,* BetaCellsinDiabetes, http://www.Betacellsindiabetes.org/Betacell-science/consensus-statement-targeting-Beta-cell-function-early (last visited Oct. 14, 2014).

[137] *Id.* ("The DREAM (Diabetes Reduction Assessment with Ramipril and Rosiglitazone Medication) study demonstrated a 62% decrease in progression to T2DM among patients with impaired glucose tolerance and/or impaired fasting glucose receiving rosiglitazone, and the ACT NOW (Actos Now for Prevention of Diabetes) trial showed a reduction of 81% with pioglitazone. In ACT-NOW, changes in the disposition index indicated both improved insulin sensitivity and Beta-cell function. Results from the TRIPOD (Troglitazone in Prevention of Diabetes) and PIPOD (Pioglitazone in Prevention of Diabetes) studies of women with prior gestational diabetes suggest similar conclusions.")

greater emphasis."[138] Dr. Leahy *et al.* specifically recommend TZD treatment on the basis of Beta-cell deterioration – citing to yet another study co–authored by Dr. DeFronzo – in support of the claim that: "[a]mong well-established therapies, thiazolidinediones (TZDs) have been shown in animal studies to prevent the loss of net Beta-cell death, and, in clinical trials appear to improve Beta-cell function in patients with T2DM as well as induce durable glycemic control."[139]

145.    Dr. Leahy pushed the envelope further by promoting the use of TZDs in treating prediabetes in a BetacellsinDiabetes.org interactive Case Study entitled "Managing a Patient with Prediabetes," in which a "common clinical situation involving difficult treatment or management decisions, followed by three different but defensible expert opinions on distinct clinical options is presented," after which participating health care providers vote and/or comment on which option they would choose.[140]  The Case Study presented as "A 45-year-old African American man with a history of obesity and hypercholesteremia has been under your care for the past three years.  He has a family history of both T2DM (Type 2 diabetes mellitus) and cardiovascular disease but no history of cardiovascular events."[141]  The three treatment options given were: (1) lifestyle modification; (2) treatment with metformin; or (3) treatment with a TZD – the latter option for which Dr. Leahy provided the expert defense.  Citing to the

---

[138] *Id.*

[139] *Id.* citing Amalia Gastaldelli *et al.*, *Thiazolidinediones improve Beta-cell function in Type 2 diabetic patients,* 292 Am. J. Physiol. Endocrinol. Metab. E871 (2007).

[140] *See Managing a Patient with Pre-Diabetes,* BetaCellsinDiabetes, http://www.betacellsindiabetes.org/casestudy/managing-patient-pre-diabetes (last visited Oct. 15, 2014).

[141] *Id.*

TRIPOD, PIPOD and DREAM study results, Dr. Leahy argued that TZDs are "tailor-made for pre-diabetes patients" given that:

> studies of many populations have shown that the progression of normal glucose tolerance to prediabetes to diabetes stems from a progressive worsening of Beta cell function. As such, the ultimate goal of a prevention therapy should be stabilizing Beta cell function. […] Importantly, with this conclusion and additional studies by these and other authors, focus for TZD's effect in prediabetes has shifted from insulin sensitization per se to Beta cell preservation.[142]

146.    Dr. Leahy's advocacy convinced at least 19% of the participating health care providers – *i.e.*, 61 out of a total 319 – that TZDs were the best option for treating prediabetes, as shown below in the resulting pie chart:[143]



---

[142] Jack Leahy, *Thiazolidinedione (TZD),* BetaCellsinDiabetes, http://www.Betacellsindiabetes.org/casestudy/managing-patient-pre-diabetes#option-3 (last visited Oct. 14, 2014).

[143] *Voting Results,* BetaCellsinDiabetes, http://www.Betacellsindiabetes.org/casestudy/managing-patient-pre-diabetes#results (last visited Oct. 14, 2014).

147.    As such, Dr. Leahy *et al.* promoted TZD treatments of IGT for Beta-cell preservation and glycemic control in rhetorical lockstep with the viewpoints developed and funded by Takeda, through Dr. DeFronzo's Banting Lecture. [144]  Through such off-label promotion, Dr. Leahy and other KOLs had influenced the prescribing practices of scores of healthcare providers in favor of TZD treatment for patients with symptoms of prediabetes/IGT.

148.    Likewise, according to testimony of Dr. Spanheimer – a paid member of Takeda's speakers bureau and a subsequent Takeda employee – he never promoted or spoke of drug products unless he himself prescribed them in his own practice.[145]  Given Dr. Spanheimer's prominent role in the promotion of Actos, it follows that Dr. Spanheimer's also prescribed Actos to his patients as a result of Takeda's promotional of Actos.

149.    Takeda's use of these KOLs, including their public advocacy and prescribing habits, significantly influenced the prescribing habits of the physician population.

## VII.    TAKEDA AND ITS PAID COTERIE DOWNPLAYED HEALTH RISKS AND USED TRUSTED DIABETES ORGANIZATIONS FOR ITS OFF-LABEL PROMOTION OF ACTOS

### A.    Takeda Downplayed Health Risks to Promote Actos

150.    Takeda and its agents engaged in an off-label strategy for Actos despite being aware of serious health risks associated with the drug.  Indeed, Takeda downplayed the risks associated with taking Actos in order to further promote its acceptance by patients and physicians.  Avandia and Actos use two different kinds of TZDs to lower blood sugar.  TZDs are a drug class historically linked to heart failure.  When Avandia came under fire for its incidence

---

[144] Leahy, *supra* n.142.

[145] Jury Trial Transcript at 1909, Vol. XIV.

of heart attack and stroke, Takeda acted to avoid GSK's sales decline and instead maximize revenue by convincing consumers and physicians that Actos was the safe alternative.

151. Takeda launched a direct-to-consumer advertising campaign for Actos on July 15, 2010, one day after the Food and Drug Administration made a pivotal decision regarding Avandia. The FDA imposed damaging requirements on GSK, the drug's manufacturer, to package the drug with inserts warning about serious cardiovascular risks. The agency came close to prohibiting the sale of the drug altogether. Takeda wasted no time assuring consumers that these risks were not class-wide to all TZDs. Takeda ran ads in at least 154 publications over a span of several weeks, hitting both local and national markets. A full-page ad from the July 15 *New York Times* stated, "Actos has been shown to lower blood sugar without increasing your risk of having a heart attack or stroke." A company statement on the advertising campaign noted, "Takeda has consistently emphasized the importance of physician education and patient safety in communications involving Actos, and has prioritized communicating the appropriate use of Actos in patients with Type 2 diabetes."[146]

152. The timing of this campaign created a direct comparison of Actos with Avandia. The statements driving the ad campaign, however, were dangerously misleading. There has been a wealth of research devoted to how two of the TZDs, pioglitazone [Actos] and rosiglitazone [Avandia], can cause heart failure, heart attacks, and stroke. Takeda's marketing suggested that Actos caused fewer incidences of heart attack or stroke and was a safer alternative to Avandia. No consensus has yet been reached on this issue. Of such studies, Sanjay Kaul, MD, FAHA,

---

[146] Marc Iskowitz, *Exclusive: Takeda launches Actos DTC campaign today*, Medical Marketing & Media (July 15, 2010), http://www.mmm-online.com/exclusive-takeda-launches-actos-dtc-campaign-today/article/174652/ (last visited Oct. 14, 2014).

FACC *et al.* wrote in 2010 for the American Heart Association's *Circulation*, "There are currently no prospective randomized, controlled trials that have examined the risk of IHD [ischemic heart disease] events associated with pioglitazone [Actos] compared with rosiglitazone [Avandia]. Observational studies have reached different conclusions regarding the relative safety of pioglitazone compared with rosiglitazone."[147] Dr. Kaul continues, "One large study that used Taiwan's National Health Insurance database observed, an increased risk of MI [heart attack]...with the addition of pioglitazone [Actos] compared with rosiglitazone [Avandia] to metformin-based therapy."[148] Dr. Kaul explains "two additional studies that used insurance claims databases for elderly patients with diabetes in New Jersey and Pennsylvania and in the province of Ontario" found pioglitazone [Actos] was not associated with a reduced risk of MI compared with rosiglitazone [Avandia]." Dr. Kaul adds that, "Finally, in a nested case-control study in British Columbia, in a cohort of prior metformin users, the addition of rosiglitazone [Avandia] was not associated with an increased risk of MI compared with the addition of a sulfonylurea or the addition of pioglitazone [Actos]."[149]

153. As Dr. Kaul *et al.* explains, so far the studies evaluating the cardiovascular risk of taking thiazolidinediones have not been adequately organized to draw "definitive conclusions":

> Taken together, these observations add further uncertainty with regard to the cardiovascular risk associated with thiazolidinediones. Substantial differences between the pioglitazone and rosiglitazone meta-analyses exist, e.g., placebo-controlled versus active-controlled trials, patient demographics, and treatment duration.

---

[147] Sanjay Kaul *et al.*, *Thiazolidinedione Drugs and Cardiovascular Risks: A Science Advisory From the American Heart Association and American College of Cardiology Foundation,* 121 Circulation 1868, 1872 (2010).

[148] *Id.* at 1872-73.

[149] *Id.* at 1873-74.

Each of these factors potentially can have a material impact on outcomes. This type of indirect comparison is potentially misleading, may result in conflicting results depending on the end points compared, and generally should be avoided. Healthcare databases used in observational studies are limited by bias and confounding, and therefore, they are not particularly well suited for drawing definitive conclusions to impact policy or clinical practice recommendations.[150]

154.    Additionally, Dr. Wolfgang C. Winkelmayer wrote in a 2008 publication for *ARCH INTERN MED*, "Recent meta-analyses have raised the possibility that rosiglitazone maleate may increase the risk of ischemic cardiovascular events, whereas pioglitazone hydrochloride could not be linked to such a risk.  We compared cardiovascular outcomes and mortality between patients initiating pioglitazone vs. rosiglitazone therapy."  His results found "[no] differences between the 2 drugs…in their rates of myocardial infarction [heart attack] or stroke."[151]

155.    Debra A. Wertz, PharmD, published a similar study in 2010 that "directly compare[d] risk of acute myocardial infarction (AMI), acute heart failure (AHF), or all-cause death among pioglitazone- and rosiglitazone-treated patients in a managed-care population" and found "no significant differences...in the risk of AMI, AHF or death."[152]  Specifically, her study found "96 patients on Avandia suffered a heart attack, compared with 121 on Actos; 265 on Avandia suffered heart failure, compared with 243 on Actos; 4 on Avandia suffered both heart

---

[150] *Id.*

[151] Wolfgang C. Winkelmayer *et al.*, *Comparison of Cardiovascular Outcomes in Elderly Patients With Diabetes Who Initiated Rosiglitazone vs Pioglitazone Therapy*, 168 Arch Intern. Med. 2368 (2008).

[152] Debra A. Wertz *et al.*, *Risk of Cardiovascular Events and All-Cause Mortality in Patients Treated With Thiazolidinediones in a Managed-Care Population,* 3 Circ. Cardiovasc. Qual. Outcomes 538 (2010).

attack and heart failure, compared with 18 on Actos; and 217 on Avandia and 217 on Actos died."[153]

156.     Dr. DeFronzo, however, began releasing follow up articles analyzing the ACT NOW patient data and attempting – with Takeda's financial support – to bolster the favorable cardiovascular data of pioglitazone in persons with prediabetes as compared to rosiglitazone (i.e., Avandia).     In a November 21, 2012 study published in Journal of the American Heart Association, Dr. DeFronzo and co-authors analyzed the ACT NOW data for the effects of pioglitazone on carotid intima media thickness (CIMT) in persons with prediabetes as a proxy measure for cardiovascular risk generally.[154]     The study concluded that pioglitazone "slowed progression of CIMT, independent of improvement in hyperglycemia, insulin resistance, dyslipidemia, and systemic inflammation in prediabetes" suggesting "a possible direct vascular benefit of pioglitazone."[155]     The study framed pioglitazone's cardiovascular results as superior to rosiglitazone, which "was associated with increased risk of CVD events and all-cause mortality."[156]     However, the study also clearly concedes that the differing results of TZD studies may be explained by differences in cardiovascular risk profiles – including potential differences

---

[153] Thomas H. Maugh II, *Heart risk from diabetes drug Actos as great as from Avandia, study finds*, L.A. Times (Aug. 24, 2010), http://articles.latimes.com/2010/aug/24/news/la-heb-avandia-actos-20100824 (last visited Oct. 14, 2014).

[154] Aramesh Saremi *et al.*, *Pioglitazone Slows Progression of Atherosclerosis in Prediabetes Independent of Changes in Cardiovascular Risk Factors*, 33 Arterioscler Thromb. Vasc. Biol. 393 (2013).

[155] *Id.*

[156] *Id.* at 397.

in reactions to TZDs at earlier stages of atherosclerosis – of the respective TZD studies' patient

populations.  Moreover, the study further concedes that:

> given the known side effects of TZDs (eg, weight gain, edema and congestive heart failure, and atypical fractures) and potential for other adverse events (eg, bladder cancer), the risk/benefit ratio should be thoughtfully evaluated before considering off-label use of pioglitazone in individuals with prediabetes. Importantly, identifying the direct vascular mechanisms by which pioglitazone reduces atherosclerosis may help refine targets for new therapeutic approaches with TZD-like, or other, medications.[157]

157.    Notwithstanding these concessions of risk, Dr. DeFronzo continued to co-author

publications analyzing the ACT NOW data, wherein the purported cardiovascular benefits of

pioglitazone, as compared to other TZDs, are presented matter-of-factly.   One such article,

published in May 2013 in *Diabetes, Obesity and Metabolism* boldly asserted, in the context of

analyzing the effects of pioglitazone on body composition and bone density in subjects with

prediabetes, that "[i]n contrast to the other TZDs, pioglitazone does not increase cardiovascular

events."[158]  Not only is this an unresolved scientific question, but DeFronzo *et al.* do not include

the necessary clarification that the claim is based upon the results of a prospective trial in the

PROactive study that studied only patients with Type 2 diabetes; *i.e.*, not patients with

prediabetes.[159]  Thus, the study misleadingly places Type 2 diabetes-based cardiovascular results

in the service of promoting pioglitazone in the prediabetes context.   The same misleading

---

[157] *Id.*

[158] G. A. Bray *et al.*, *Effect of pioglitazone on body composition and bone density in subjects with prediabetes in the ACT NOW trial*, 15 Diabetes, Obesity and Metabolism 931 (2013).

[159] *Id.*

assertion was made in a follow up analysis of the ACT NOW data,[160] co-published by Dr. DeFronzo on July 17, 2013 in *Diabetes*. In analyzing the "physiologic correlates" of the pioglitazone treatment in the ACT NOW study, the article asserts that, in contrast to rosiglitazone, which "has been greatly restricted because of cardiovascular safety concerns," pioglitazone "does not increase cardiovascular events." Thus, the article once again imports this finding from the prospective Type 2 diabetes clinical trial in the PROactive study into its prediabetes analysis of the ACT NOW data. As a result, the article misleadingly suggests that its main clinical conclusion that "[p]reservation/improvement in beta cell function is the main mechanism by which pioglitazone prevents diabetes and improves glucose tolerance" is clinically linked to cardiovascular safety in prediabetes populations.[161]

158. The promotion of pioglitazone's cardiovascular benefits in comparison with rosiglitazone continued in an August 2013 article co-authored by Dr. DeFronzo published in *Diabetes Care* and "based on the presentations from the 4th World Congress on Controversies to Consensus in Diabetes, Obesity and Hypertension (CODHy)" and "made possible in part by unrestricted educational grants from […] Takeda" among others.[162] The article's claims to pioglitazone's cardiovascular benefits – once again based upon the PROactive clinical results of Type 2 diabetes patients – were as bold as ever, asserting that pioglitazone "is the only antidiabetes medication shown, in a large prospective placebo-controlled outcome study, to reduce cardiovascular events" while also pointing out that "rosiglitazone increases both plasma

---

[160] Ralph A. Defronzo *et al.*, *Prevention of Diabetes with Pioglitazone in Act Now: Physiologic Correlates*, Diabetes (July 17, 2013).

[161] *Id.*

[162] Roy Eldor *et al.*, *In Vivo Actions of Peroxisome Proliferator-Activated Receptors Glycemic control, insulin sensitivity, and insulin secretion*, 36 Diabetes Care S162 (2013).

LDL cholesterol and triglycerides" and that "concerns about cardiovascular safety have led to removal of rosiglitazone from U.S. (56) and European markets."[163] Further, the article promotes off-label use of TZDs for the prevention of Type 2 diabetes, citing "Six large prospective, randomized, double-blind, placebo-controlled studies (TRIPOD […], PIPOD […], DPP […], DREAM […], CANOE […], and ACT NOW […]) have provided conclusive evidence that thiazolidinediones dramatically reduce by 52-72% conversion of prediabetes (IGT and/or IFG) to T2DM."[164]

159.    As described in greater detail herein *supra*, at least two of the Avandia/Actos comparison papers published during this period were shown to have been ghostwritten by Takeda: "PROactive: Time for a critical appraisal" endorsed/co-authored by Dr. DeFronzo and Dr. Robert J. Chilton; and "Cardiovascular risk and thiazolidinediones – what do meta-analyses really tell us?" endorsed/co-authored by Dr. Chilton.

## B.    Recent Court Proceedings Reveal Internal Aspects of Takeda's Knowledge of Health Risks

160.    The risks associated with taking Actos are not small. They include bladder cancer, weight gain, bone fractures, water retention, edema, heart condition, and liver disease. As Dr. Helen Ge – the relator in a separate federal False Claim Act action – alleged, Takeda knew or should have known about the excess bladder cancer risk of Actos by 2005 (if not earlier), but Takeda deliberately failed to warn patients and providers about this cancer risk as well as known risks of Congestive Heart Failure (CHF).[165] As summarized in Relator's briefing:

---

[163] *Id.* at S166.

[164] *Id.* at S167.

[165] Second Amended False Claims Act Complaint at ¶¶ 98, 105-110, *United States of America et al. v. Takeda Pharm. Ltd. et al.*, No. 10-cv-11043-FDS (D. Mass. Apr. 5, 2012), ECF No. 17.

[As] a former medical reviewer in Takeda's pharmacovigilance division where she was responsible for reviewing incoming adverse event reports and identifying and evaluating potential safety signals for certain Takeda drugs, … [Dr. Ge] had direct knowledge of the Actos bladder cancer risk but **encountered resistance from her superiors when she tried to report bladder cancer as related to Actos**.  On multiple occasions, Dr. Ge's supervisors directed her to change her 'related' assessment to unrelated and, in addition, **numerous bladder cancer cases were never reported to the FDA**.  In addition to concealment and under-reporting of the bladder cancer risks, Takeda also failed to properly report each Actos-related Congestive Heart Failure (CHF) adverse event to the FDA.  Specifically, **Takeda instructed its medical reviewers not to report hundreds of non-hospitalized or non-fatal CHF cases as 'serious' adverse events** and thus avoided its responsibility of accurately analyzing and reporting these hundreds of serious adverse events to the FDA.  Based upon her observations while at Takeda, Dr. Ge estimates that Takeda failed to report several hundred CHF events as "serious" between late 2007 and 2010.  When Dr. Ge complained to her superiors that her medical assessments were being downgraded from 'serious' to 'non-serious' and that, as a result of this, the CHF events were being under-reported to the FDA, her contract with Takeda was terminated.[166]

161.   Numerous internal details of Takeda's systematically fraudulent messaging regarding Actos' CV and bladder cancer risks and purported lipid benefits were also revealed in the recent Actos Trial testimony.  Of note was Dr. Spanheimer's damning testimony surrounding Takeda's conduct of and public messaging surrounding the PROactive study results.  Internal documents show that Takeda was well aware that PROactive was a "failed" study, that "PROactive results were trending towards a positive difference between the two treatment arms, but at the end of the study the results showed insignificant effects on macrovascular events and showed no significant differences on the metabolic parameters" and that, therefore, Takeda

---

[166] Relator's Opposition to Defendants' Joint Motion to Dismiss Relator's Second Amended Qui Tam Complaints at 2-4, *United States of America et al. v. Takeda Pharm. Ltd. et al.*, No. 10-cv-11043-FDS (D. Mass. July 17, 2012), ECF No. 35 (emphasis added).

cannot claim statistically significant positive macrovascular results and "Cannot talk about lipid effects." Dr. Spanheimer stated internally that the PROactive results were, as such, "a nightmare scenario to defend."[167]

162.    Takeda internal documents reveal that, as negative data regarding Actos bladder cancer risk began to emerge with the PROactive study, Takeda's policy was that it "will Not (sic) send a Dear Doctor letter about bladder cancer issues. We have No (sic) plan to include this bladder cancer language into our CCSI," where CCSI refers to Takeda's internal "Company Core Safety Information" database, which supports the informed consent process for study subject intake. In other words, Takeda's stated internal policy was to "Not" reveal the bladder cancer risks either to prescribing physicians or to inform future test participants in informed consent documents or even to investigators running the tests.[168]

163.    This policy was again substantiated in an Actos Trial exhibit of a Powerpoint presentation for a June of 2011 national sales force convention, which, in the context of coaching the sales force on a bladder cancer "verbatim" – i.e., a required talking point response to a bladder cancer question from a physician – instructed the sales force to "wait for health care professionals to ask the question [about bladder cancer] before using the verbatim. If no questions or concerns, ***do not discuss bladder cancer and sell, sell, sell***."[169]

164.    The strategy of obfuscating internally known truths about Actos health risks was further substantiated in Dr. Spanheimer's testimony about Takeda's Actos sales representative Gigi Chen.  In response to the publication of an Article in USA Today regarding the Avandia

---

[167] Jury Trial Transcript at 3745-47, Vol. XXV.

[168] Jury Trial Transcript at 3673, Vol. XXIV.

[169] *Id.* at 3660 (emphasis added).

safety hearings, in which risks – including potential bladder cancer side effects – of other TZDs were mentioned, Chen advised a member of her sales team that the bladder cancer risk was "[o]bviously, not something we would bring up or mention on our sales calls, but just something to be aware of in case it is mentioned out in the field."[170] In addition to advising the Actos sales force not to disclose bladder cancer risks to doctors while out on sales calls, Chen's own specific practice of non-disclosure and false representations of Actos' purported benefits to doctors on her sales calls were manifest in Dr. Spanheimer's testimony concerning one of Chen's sale call to a doctor, which was made shortly after Takeda issued the misleading PROactive press release. In her report of that sales call, Chen made misleading representations of Actos' purported ability to reduce CV risk, stating: "Actos: Still good on all samples. Asked if [the doctor] had an opportunity to read PROactive? Not yet. Reminded him of importance of protecting diabetes patients from CV risk."[171]

C.     **Critics Wary of the ACT NOW Study and Dr. DeFronzo's Recommendations**

165.    In March 2011, Dr. DeFronzo made statements to the press in response to his study further promoting the use of pioglitazone for the treatment of prediabetes. "It's enormous," he said ACT NOW's implications.  "It's the most impressive study ever done shown to prevent diabetes in the world."  Dr. DeFronzo encouraged the medical community to pharmacologically treat indications of prediabetes.  "If you delay for five or ten years the onset of diabetes, more

---

[170] Ex. P7141-00001 to Jury Trial.

[171] Jury Trial Transcript at 3790, Vol. XXV.

importantly if you can stop it, then of course this has enormous benefit."[172]  After emphasizing the need to treat prediabetes, he emphasized the need to treat it with Actos, saying: "[p]ioglitazone [Actos] was extremely effective in preventing diabetes."  Rather than first trying changes in diet and exercise, then cautiously prescribing low doses of metformin, and then finally resorting to pioglitazone as a final effort to control glucose levels in extremely high-risk patients, Dr. DeFronzo recommended initiating pioglitazone and lifestyle changes at the same time.  He said, "[i]f someone is at high risk, then I would, in addition to trying to get them to lose weight and exercise, recommend medication, and personally, I favor pioglitazone."[173]

166.    Less biased skeptics warned, however, that the ACT NOW study demonstrated negative side-effects that outweighed potential benefits of taking pioglitazone for the purpose of offsetting the arrival of diabetes.  Matthew Herper at Forbes pointed out, "[P]atients on Actos were significantly more likely to have side effects, including fluid buildup and weight gain. There were a few more heart problems, and three deaths in the Actos group compared to one in the placebo group.  That doesn't mean Actos was costing lives, but it was not saving them."[174] *HealthDay* reporter Serena Gordon cautioned, "[t]he news wasn't all good…[t]he people in the pioglitazone group experienced more adverse events (151 vs. 121) and gained an average of

---

[172] Wendy Rigby, *'Blockbuster' study shows tiny pill can help prevent diabetes*, KENS 5 (Nov. 7, 2013), http://www.kens5.com/story/news/local/2014/06/18/10823995/ (last visited Oct. 14, 2014).

[173] *See* Serena Gordon, *Actos Cut Risk of Prediabetes Becoming  Diabetes in Study*, HealthDay (Mar. 23, 2011), http://news.healingwell.com/index.php?p=news1&id=651185 (last visited Oct. 14, 2014).

[174] Ryan Luce, *Actos May Help Prevent Diabetes – But You Probably Don't Want It (Yet),* Scientific Blogging (Mar. 25, 2011), http://www.science20.com/print/77518 (last visited Oct. 14, 2014).

about nine pounds, and experienced more fluid retention (edema), than people taking the placebo. The U.S. Food and Drug Administration has warned that, as with other thiazolidinediones, pioglitazone can cause fluid retention, potentially leading to or exacerbating heart failure."[175]

167.    In fact, when pressed by *Renal Business Today* in March 2011 about the weight gain, fluid retention, and cardiovascular events observed study participants, Dr. DeFronzo responded, "No drug is perfect."[176]  Further, Dr. DeFronzo's co-researcher Dr. Robert R. Henry did not share Dr. DeFronzo's enthusiasm for prescribing the drug to individuals who could reduce their risk of diabetes with safer alternatives.  He stated that lifestyle intervention would remain the recommended treatment for most of his patients with prediabetes and that he "might consider pioglitazone in patients who have a very high diabetes risk, but this would be a very restricted population," adding that "[a]s with all drug treatments, the risks and benefits have to be weighed."[177]

168.    Commenting on the ACT NOW study, Dr. Steven Nissen, chairman of cardiovascular medicine at the Cleveland Clinic, who first raised questions about the safety of rosiglitazone, has commented "The F.D.A. has never approved any drug to prevent diabetes….

---

[175] *See* Gordon, *Actos Cut Risk of Prediabetes Becoming  Diabetes in Study*, *supra* n.173.

[176] *Drug Prevents Type 2 Diabetes in High–Risk Individuals,* Science Daily, (Mar. 23, 2011), http://www.sciencedaily.com/releases/2011/03/110323183808.htm (last visited Oct. 14, 2014).

[177] Salynn Boyles, *Study Shows Actos Lowers Risk of Developing Diabetes in People With Prediabetes*, WebMD Health News (Mar. 23, 2011), http://www.webmd.com/diabetes/news/20110323/diabetes-drug-actos-may-also-help-prediabetes (last visited Oct. 14, 2014).

There's a reason for skepticism, because we don't know whether these drugs are really preventing diabetes or just masking it."[178]

169.    Some practitioners recognized the benefits of prescribing pioglitazone to select patients who already have severe cases of diabetes, but worried about encouraging its use among healthier populations.    Dr. Timothy S. Harlan of Tulane University Medical Group told *Heartwire* in March 2011, "I don't know that these data are earth-shattering. We know these medications control [blood sugar] quite well, but the problem is that they often do so at the expense of weight gain and edema." He went on, "I have prescribed [pioglitazone], and I do it very carefully, as a third-line therapy. At this stage, I don't think I would prescribe this to prevent diabetes in my patients. I'd like to see a lot more data before I widely prescribe it." Instead, Dr. Harlan recommended lifestyle adjustments such as increases in exercise and making healthier diet choices: "[i]nsurance companies will willingly reimburse for medicines like this, yet we will not invest that same level in helping people do what works better, and that's lifestyle changes."[179]

170.    Dr. Vivian Fonseca said diet and exercise are still the best therapies against developing Type 2 diabetes, followed by metformin.    When asked about pioglitazone by *CBC News* in March 2011, Dr. Fonseca noted a lack of long-term safety information for the drug in people with prediabetes.[180]    Dr. Fonseca made this statement despite having received funding

---

[178] *See* Rabin, *Regimens: Drug Is Seen to Limit Progression to Diabetes*, *supra* n.16.

[179] Jim Kling, *Thiazolidinedione May Prevent Diabetes in Some Patients,* Medscape Medical News (Mar. 25, 2011), http://www.medscape.com/viewarticle/739704 (last visited Oct. 14, 2014).

[180] *Pill stops move to Type 2 diabetes*, CBC News (Mar. 24, 2011), http://www.cbc.ca/news/health/pill-stops-move-to-type-2-diabetes-1.1107041 (last visited Oct. 14, 2014).

from Takeda when she was president-elect of medicine and science for the American Diabetes Association.

171.    ADA vice president for medical affairs Sue Kirkman, MD, said to *WebMD* in March 2011 that patients at risk for Type 2 diabetes should first be encouraged to make lifestyle changes before considering any drug treatment: "[a]nytime we talk about long-term drug treatment for prevention, we have to have a very high reassurance that these treatments are both safe and effective."[181]

172.    Mary Parks of the Food and Drug Administration stated: "a question exists as to whether pharmacological intervention with antidiabetes agents merely treats disease in advance of its diagnosis, thereby masking its detection."  An example of Parks described can be seen in the TRIPOD study, which found that three years after treatment, there was similar incidence of type 2 diabetes in patients formerly treated with TZDs as in those given a placebo.  Regarding such findings, Parks said it is uncertain "[w]hether or not this is evidence that these drugs are not delaying progression to diabetes," and also noted that "if you stop therapies then the benefit may no longer be evident."[182]

173.    There is growing concern "about too much detection and treatment of early diabetes,"[183] said H. Gilbert Welch, author of *Overdiagnosed: Making People Sick in the Pursuit*

---

[181] *See* Boyles, *Study Shows Actos Lowers Risk of Developing Diabetes in People With Prediabetes*, *supra* n.177.

[182] Zachary T. Bloomgarden, *American College of Endocrinology Pre-Diabetes Consensus Conference: Part Two*, 31 Diabetes Care 2222, 2224 (2008).

[183] H. Gilbert Welch, *If You Feel O.K., Maybe You Are O.K.*, N.Y. Times (Feb. 27, 2012), http://www.nytimes.com/2012/02/28/opinion/overdiagnosis-as-a-flaw-in-health-care.html (last visited Oct. 14, 2014).

*of Health*.  He wrote in the *New York Times*, "the fastest way to get heart disease, autism, glaucoma, diabetes, vascular problems, osteoporosis or cancer ... is to be screened for it […] [i]n other words, the problem is overdiagnosis and overtreatment."[184]  A study published in *Diabetes Care* back in 2002 concluded, "[t]here are no randomized trials demonstrating the benefits of early diagnosis through screening of asymptomatic individuals."[185]

### D. Takeda Obtained Access to and Used Trusted Diabetes Organizations for its Off-Label Promotion of Actos

174.  Takeda paid the ADA $2.8 million in 2008 and hired president-elect of medicine and science, Dr. Vivian Fonseca, as a paid consultant.  Subsequently, Takeda used the ADA to distribute information throughout the diabetes community promoting the treatment of prediabetes with Actos.  Between June 6 and June 10 of 2008, the ADA hosted its 68th Scientific Session, an event featuring the most recent developments in the study and treatment of diabetes.  Dr. DeFronzo played a significant role in the planning and execution of the event.  Not only was he a member of the Scientific Sessions Planning Committee, but he was also honored with the Banting Award and given the podium for the Banting Lecture.  In his speech, he described the effect that TZDs had on prediabetes patients and specifically mentioned Actos.  At another point in the session, Dr. DeFronzo presented preliminary findings from the ACT NOW study.  In the ADA's write-up of the conference in *Diabetes Care*, Dr. DeFronzo and his ACT NOW study was endorsed once again.  The article explained the details of the ACT NOW study and quoted Dr. DeFronzo saying, "We need to intervene early.... It would be ideal to begin ... long before we

---

[184] *Id.*

[185] American Diabetes Association, *Position Statement:  Screening for Diabetes*, 25 Diabetes Care 521 (2002).

have IGT."    Dr. Vivian Fonseca told reporters the results from the ACT NOW study looked excellent.

175.    Takeda intended its donation to influence the ADA's decision to place Dr. DeFronzo on the Planning Committee, to award Dr. DeFronzo the Banting Award, thereby featuring him in the Banting Lecture, and to allow Dr. DeFronzo to present his preliminary ACT NOW findings.

176.    Like the ADA, the AACE is a respected and influential organization within the diabetes community.  The very year the FDA approved Takeda's application to market Actos, Takeda became a Corporate AACE Partner.  Of such partners, the AACE says, "their generous support and valuable input helps [sic] make possible the many educational programs and activities that AACE provides for its members."   As with the ADA, Takeda similarly used the AACE to influence the diabetes community to treat prediabetes pharmacologically.

177.    The American College of Endocrinology (ACE) – the educational and research arm of the AACE – held a Consensus Conference in Washington, DC, on July 21-22, 2008 that encouraged policy-makers to consider prediabetes as more than a defined state of elevated blood glucose, and instead as a risky state of health warranting medical attention and treatment.  Dr. DeFronzo was one of 23 featured experts called to present and review relevant research on prediabetes and develop a treatment recommendation.  Dr. DeFronzo "discussed approaches to early treatment of diabetes, with focus on the role of thiazolidinediones (TZDs)."  Most notably, "he presented an analysis of the development of diabetes that he interpreted as showing that 'pathophysiologically [people with prediabetes] really have Type 2 diabetes,'" and went on to suggest, "'we need to intervene early [in order to prevent the onset of Type 2 diabetes].... It

would be ideal to begin ... long before we have IGT.'" Also at the conference, "DeFronzo described the Actos Now for Prevention of Diabetes (ACT-NOW) study."

178. At the conclusion of the conference, the first ever official treatment recommendations were made for the condition of prediabetes. The group of experts organized by the AACE went beyond suggesting lifestyle changes in order to control the initial warning signs of diabetes. The experts expressed their belief that certain drugs may play a role in treating prediabetes if diet and exercise do not lower people's blood glucose levels enough. "Although lifestyle can clearly modify the progression of patients towards overt diabetes, it may not be sufficient," said Alan J. Garber, MD, PhD, FACE, Professor of Medicine, Baylor College of Medicine, Houston, and Chairman of the Consensus Conference. "Medications may well be required, particularly in high risk groups." In a statement announcing its treatment recommendation, the AACE highlighted the point that "at this time, there are no pharmacologic therapies that have been approved by the FDA for prevention of the conversion of prediabetes to diabetes."

179. On July 23, 2008, following the conference, the AACE and the American College of Endocrinology hosted a media briefing at the National Press Club in Washington, D.C. highlighting the need for a new approach to diabetes management. The questions addressed were: (1) What are the clinical risks of not treating prediabetes?; (2) Can society afford the costs of not treating the prediabetes state?; and (3) What goals and treatment modalities should be the focus of the management of prediabetes or how early in the continuum should we treat diabetes?

180. Five years later, the AACE held its annual 22nd Annual Scientific and Clinical Congress on May 1-5, 2013 in Phoenix, AZ, which included a "Diabetes Update-2013" debate between clinical leaders in diabetes care Drs. Vivian A. Fonseca, Christie Ballantyne and Dr.

DeFronzo.  During the debate DeFronzo continued to promote Actos for pre-diabetes.  argued that while weight loss and other changes in lifestyle have been clinically proven to change the course of the disease in many people, these changes are difficult to make.  He called for the use of medication to keep the genie in the bottle, saying of diet and exercise, "[i]t's time we face reality, and the reality is that this [lifestyle change] doesn't work on a long-term basis."  He further expressed his "bias […] that prediabetes is diabetes [...] we have an arbitrary cut point" and stressed that diabetes is a spectrum.

181.    Takeda used these events as a platform to convince the medical community that pharmacological treatment should be implemented for prediabetes conditions.

## VIII.    DEFENDANTS' PROMOTION OF ACTOS CAUSED HEALTH CARE PROVIDERS TO PRESCRIBE ACTOS OFF-LABEL FOR IGT/PREDIABETES AT GREAT EXPENSE TO GOVERNMENT PROGRAMS

### A.    Takeda's Annual Reports Show the Effectiveness of Actos Sales Marketing

182.    By 2004, Takeda, through aggressive marketing and promotion, had pushed sales of Actos into the billions of dollars.  Nevertheless, Avandia sales reached $2 billion for FY 2004, while Actos sales lagged at $1.5 billion.[186]  Furthermore, in mid-2005, market analysts were predicting a drop-off in Actos sales relative to Avandia, given that Takeda's U.S. Actos marketing partnership with Lilly would come to an end in September 2006.  Without a $13.9 billion drug company like Lilly using its substantial market power to drive Actos sales in the U.S. – as Lilly had done since the introduction of Actos in 1999 – analysts predicted that Takeda

---

[186] Aaron Smith, *Diabetes split could shake up market,* CNN/Money (June 24, 2005), http://money.cnn.com/2005/06/24/news/fortune500/actos/ (last visited Oct. 14, 2014).

would be left in the lurch to market Actos until its patent expiration in 2011 and that GSK would likely win more of Actos' market share.[187]

183.    In fact, Actos sales flouted analyst predictions and surged past Avandia in the years following 2006.  By 2009, Actos sales had reached $3.4 billion while Avandia's had fallen to $521 million.[188]  Avandia's drop in sales was partly due to emerging evidence of significant cardiovascular risk associated with Avandia use, which prompted the FDA to vote to restrict sales of Avandia on July 14, 2010.[189]  Similar cardiovascular risks were associated with Actos use during this period, as were significant risks of bladder cancer in clinical trials, such that the FDA initiated a safety review of Actos in 2010.[190]  Takeda actively suppressed the extent of those risks however while concurrently attempting to expand it sales into the prediabetes market.

184.    Actos' surge in market share over Avandia is not explained by the news of Avandia's risk factors alone.  The $3.5 billion in Actos sales that Takeda was able to achieve in 2010 and the $3.6 billion in its peak sales year of 2011 – the year that Actos went off patent – would have been impossible without an aggressive illegal campaign by Takeda to promote off-

---

[187] *Id.*

[188] Duff Wilson, *Avandia's Sales Drop Far Behind Actos*, N.Y. Times (July 12, 2010), http://prescriptions.blogs.nytimes.com/2010/07/12/avandias-sales-drop-far-behind-actos/ (last visited Oct. 14, 2014).

[189] Gardiner Harris, *F.D.A. Panel Votes to Restrict Avandia*, N.Y. Times (July 14, 2010), http://www.nytimes.com/2010/07/15/health/policy/15diabetes.html (last visited Oct. 14, 2014).

[190] *See* Richard W. Nesto, *Thiazolidinedione Use, Fluid Retention, and Congestive Heart Failure: A Consensus Statement From the American Heart Association and American Diabetes Association*, 108 Circulation 2941 (2003); Peggy Peck, *FDA Says It Will Review Pioglitazone Safety*, MedPage Today (Sept. 17, 2010), http://www.medpagetoday.com/Endocrinology/Diabetes/22274 (last visited Oct. 14, 2014).

label uses of Actos. Indeed, on information and belief, a significant percentage of Actos sales during this period were for off-label uses for patients with prediabetes.

185. Takeda's 2008 Annual Report alluded to this aggressive campaign, emphasizing the high revenue generated by Actos sales, the marketing efforts planned to increase those sales, and the revenue forecasts moving forward. The report stated, "Net sales of the anti-diabetic drug Actos (generic name: pioglitazone hydrochloride) rocketed to reach ¥41.6 billion (a 23.6 percent increase over the previous year)."[191] "As for net sales [in fiscal year 2008], we anticipate increased revenue from the previous year, based on growth in the sales of our core products centering on Actos, both at home and abroad."[192] And as for marketing, Takeda "has established an **outstanding customer marketing network with general practitioners** and have extensive experience in the area of gastroenterological diseases. By incorporating this outstanding resource Takeda aims to further enhance its sales and marketing capabilities in the U.S. market, thereby **maximizing the product potential of Actos**."[193]

### B. Defendants' Return on Investment Was Substantial

186. Takeda received a great return on its investment. Dr. DeFronzo and the other KOLs referred to or described herein received significant financial remuneration from Defendants for the purpose of influencing their actions to promote the illegal off-label use of

---

[191] Takeda Pharmaceutical Company Limited, *Annual Report 2008*, at 40, http://www.takeda.com/investor-information/annual/pdf/index/ar2008_en.pdf (last visited Oct. 14, 2014).

[192] *Id.* at 7.

[193] *Id.* at 10 (emphasis added).

Actos for prediabetes. This remuneration included payments to members of the Takeda speakers bureau at a rate of between $2,000.00 and $3,000.00 per speech.[194]

187.   In 2011 – the year that the Actos patent expired – several hundred members of Takeda's Actos diabetes speakers bureau were fired en masse by form letter. Prior to that, Defendants marketing expenditures had amounted to millions of dollars annually and, according to Relator, over $100 million total. The reason for such outlays was to illegally maximize the exploitation of the off-label IGT/prediabetes market until after the Actos patent expired, since expenditures were no longer cost effective.

188.   Takeda's off-label marketing was a better investment than obtaining FDA approval. No pharmaceutical product has ever received FDA approval for the treatment of prediabetes. Researchers had investigated treating prediabetes with several different drugs, including those in the class TZDs, but results were not considered sufficient to obtain FDA approval.[195]

---

[194] *See generally*, Riordan, *News Report Links Avandia Panelists to Drug Makers*, *supra* n.128.

[195] (1) William C. Knowler *et al.*, *Reduction in the Incidence of Type 2 Diabetes with Lifestyle Intervention or Metformin,* 346 New Eng. J. Med. 393 (2002); (2) Jean-Louis Chiasson *et al.*, *Acarbose for prevention of Type 2 diabetes metlitus: the STOP-NIDDM randomised trial*, 359 Lancet 2072 (2002); (3)  A. Ramachandran *et al.*, *The Indian Diabetes Prevention Programme shows that lifestyle modification and metformin prevent Type 2 diabetes in Asian Indian subjects with impaired glucose tolerance (IDPP-1)*, 49 Diabetologia 289 (2006); (4) Thomas A. Buchanan *et al.*, *Preservation of Pancreatic Beta-Cell Function and Prevention of Type 2 Diabetes by Pharmacological Treatment of Insulin Resistance in High-Risk Hispanic Women*, 51 Diabetes 2796 (2002); (5) Jare S. Torgerson *et al.*, *XENical in the Prevention of Diabetes in Obese Subjects (XENDOS) Study*, 27 Diabetes Care 155 (2004); (6) The Expert Committee on the Diagnosis and Classification of Diabetes Mellitus, *Follow-up Report on the Diagnosis of Diabetes Mellitus,* 26 Diabetes Care 3160 (2003).

189.     The fact that no other major study of the effects of pioglitazone on IGT/prediabetes patients other than ACT NOW was ever funded or conducted by Takeda or any other entity, together with the fact that Takeda delayed its IGT/prediabetes study until 2007 – four years before Actos' patent was due to expire – shows that Takeda had no intention of engaging in the expense required to obtain FDA approval for the use of Actos for IGT/prediabetes.  Not only does the FDA require at least two full-fledged studies to support a drug patent submission, but, in the absence of any hope of a valid FDA-approved off-label use for Actos, the massive outlay of funds by Takeda in support of the promotion of the ACT NOW study could not have had any purpose other than the illegal one of boosting Actos off-label sales.[196]

190.     In exchange for payments to physicians, KOLs and medical organizations, Actos sales for off-label uses reached as much as 30% of overall sales annually, according to estimates of competitors.

### C.     Much of the Cost of Off-Label Actos Scripts Was Borne by Government Programs

191.     Among the largest global purchasers of Actos is the U.S. government and the various state and local governments.  For example, during the period April 1, 2011 through March 31, 2014, three members of the Suffolk County (NY) Health Plan were prescribed Actos.  None of these members were diabetic.  Nevertheless, as a group, they were prescribed a total of

---

[196] U.S. Department of Health and Human Services *et al.*, *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products* (May 1998), http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm 078749.pdf (last visited Oct. 14, 2014).

11 scripts, for which the Suffolk County Health Plan paid a total of $3,170.14 during this period. The Suffolk County Health Plan is a government plan and recovery for it can be had under the New York State False Claims Act. The official data for these script transactions is as follows:

| Member ID | NDC | Drug Name | Scripts | Plan Paid |
|-----------|-----|-----------|---------|-----------|
| Member ID | 64764015105[*] | ACTOS | 2 | $975.47 |
| Member ID | 64764015104[**]<br>64764015105 | ACTOS<br>ACTOS | 2<br>4 | $131.49<br>$1,590.18 |
| Member ID | 64764015104 | ACTOS | 3 | $473.00 |

192.    With respect to Medicare, Actos is one of only a handful of drugs which exact the highest coverage costs of all drugs covered under the Federal Medicare Part D program. Furthermore, the majority of state Medicaid programs include Actos on their preferred drug lists – oftentimes, together with Avandia – for treatment of diabetes or simply as the preferred form of TZD for Medicaid covered prescriptions. As detailed herein *infra*, during the years relevant to the facts herein alleged, Medicare and Medicaid drug costs to Federal and State drug programs were significantly increased by the expansion of Actos prescriptions by healthcare professionals, resulting from Takeda's off-label promotions of Actos.

193.    Average annual spending on both Medicare and Medicaid has more than doubled, from $10.26 billion and $8.54 billion, respectively, for the 1990-1999 period, to $25.89 billion and $18.20 billion, respectively, for the 2000-2009 period.[197]    According to a recent

---

[*] Actos, 15mg, 90 Tablet in 1 Bottle

[**] Actos, 15mg, 30 Tablet in 1 Bottle

[197] Calculations are based on Government Spending Details for years 1990-2010 from the following website: *Government Spending Details,* US Government Spending,

Congressional Research Service memorandum, annual Medicare spending on Diabetes-Related Actions hovered between $9 and $9.29 billion for the 2009 to 2012 period.[198] During the period of Defendants' Actos marketing push, Actos grew to be one of the eight drugs with the highest Medicare Part D costs, according to a December 2013 Issue Brief published by the Kaiser Family Foundation.[199] Indeed, by 2010, "Lipitor, Zyprexa, Seroquel, Actos, and Plavix – five of the eight drugs with the highest Part D drug costs – represented 13 percent of total Part D drug costs."[200] Further, in 2009, the Department of Health reported Medicaid's pharmacy spending on Actos at $45 million.[201]

194. According to an expert affidavit filed in a separate federal False Claim Act action against Takeda in the District of Massachusetts, Actos sales more than doubled from roughly

http://www.usgovernmentspending.com/year_spending_2014USbn_XXbs6n_1011121314#usgs 302 (last visited Sept. 26, 2014).

[198] Memorandum from Congressional Research Service, *Federal Activities and Spending for Diabetes Prevention, Research, and Treatment*, at 17 (Oct. 26, 2012), http://diabetescaucus-degette.house.gov/sites/diabetescaucus.house.gov/files/documents/2012_1026_CD%20Diabetes_ Memo_Rev.pdf (last visited Oct. 14, 2014).

[199] Jack Hoadley *et al.*, *Medicare Part D Prescription Drug Plans: The Marketplace in 2013 and Key Trends, 2006-2013*, Kaiser Family Foundation (Dec. 11, 2013), http://kff.org/medicare/issue-brief/medicare-part-d-prescription-drug-plans-the-marketplace-in-2013-and-key-trends-2006-2013/ (last visited Oct. 14, 2014).

[200] *Id.*

[201] *New York Medicaid Redesign Team, Building a more affordable, cost-effective Medicaid program, January 13, 2011 – Albany, New York,* State of N.Y. Department of Health, at 46, http://www.health.ny.gov/health_care/medicaid/redesign/docs/2011-01-13_redesign_team_presentation.pdf (last visited Oct. 14, 2014).

$1.3 billion in 2003 to $3.3 billion in 2011 – with public sector programs like Medicaid and Medicare accounting for more than half of the purchases.[202]

195.    This affidavit, filed by Joel W. Hay, Ph.D., a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Schaeffer Center for Health Policy and Economics and in the Department of Economics at the University of Southern California, provides estimates of the percentage of Actos sales paid for by Medicare, Medicaid, Veterans Health, TriCare or other public programs – projecting the percentages through 2012 using linear regression – based upon the U.S. Medical Expenditure Panel Survey ("MEPS") data through 2009.  Dr. Hay's estimates (below) show that over half of the sales of Actos were paid for by public sector health programs:

**Table 1. Actos Public Sector Sales Percentages by Year Since Launch**

| 2003 | 23.2% | Actual |
|------|-------|--------|
| 2004 | 24.5% | Actual |
| 2005 | 33.7% | Actual |
| 2006 | 56.2% | Actual |
| 2007 | 54.5% | Actual |
| 2008 | 59.0% | Actual |
| 2009 | 64.1% | Actual |
| 2010 | 57.7% | Predicted |
| 2011 | 60.3% | Predicted |
| 2012 | 62.9% | Predicted |

**Table 2: Annual Actos Sales ($1,000s)**

|      | **Total** | **Public Sector** |
|------|-----------|-------------------|
| 2003 | $1,332,104 | $309,111 |
| 2004 | $1,388,002 | $340,281 |
| 2005 | $1,605,016 | $541,491 |
| 2006 | $1,926,293 | $1,082,595 |
| 2007 | $2,229,333 | $1,213,947 |

---

[202]  *See* Affidavit of Joel W. Hay, Ph.D at ¶¶ 17, 18, *United States of America et al. v. Takeda Pharm. Ltd. et al.*, No. 10-cv-11043-FDS (D. Mass. filed Nov. 29, 2012), ECF No. 48-4.

| | | |
|------|------------|------------|
| 2008 | $2,447,602 | $1,444,350 |
| 2009 | $2,531,621 | $1,621,609 |
| 2010 | $2,631,930 | $1,517,850 |
| 2011 | $3,330,583 | $2,008,200 |
| 2012 Q1-Q3 | $1,539,017 | $968,363 |
| TOTAL | $20,961,501 | $11,047,796 |

*See id.*, n.202.

196.     These above statistics are well in line with a letter to the New England Journal of Medicine co-authored by Drs. Mark R. Goldstein[203] and Luca Mascitelli[204] in response to the ACT NOW study, which asserted, among other things, that "[t]his prospective study by DeFronzo and colleagues is likely to spur an increased use of pioglitazone in wider segments of the population."[205]

197.     Dr. Matthew Mintz has also described his own practice as relatively unbiased and accepting of both Medicare and Medicaid patients and indicated that other government health programs have been and continue to be among those patients for whom Actos is being prescribed for the treatment of prediabetes/IGT.

198.     The above allegations demonstrate that municipal entities protected by the FCA statutes spent significant sums for the illegal off-label promotion of Actos for prediabetes.

## IX.     DEMAND FOR JURY TRIAL

199.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Peter P. Lawton hereby demands a trial by jury on all issues so triable.

---

[203] A primary care physician in the NCH Physician Group of Naples, FL.

[204] A military medical doctor with Comando Brigata Alpina Julia Udine, Italy.

[205] Karen C. McCowen & Vera T. Fajtova, *Pioglitazone for Diabetes Prevention*, 365 New Eng. J. Med. 182, 183 (2011), http://www.nejm.org/doi/pdf/10.1056/NEJMc1104572 (last visited Oct. 14, 2014).

## X.     CLAIMS FOR RELIEF

<u>COUNT ONE:</u>
<u>ANTI-KICKBACK VIOLATIONS</u>

200.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

201.     The anti-kickback statute ("AKS") is violated if one purpose of the remuneration is to induce future referrals of business reimbursable under federal health care programs. *United States v. Shaw,* 106 F. Supp. 2d 103, 121 (D. Mass. 2000), citing *United States v. Greber,* 760 F.2d 68 (3d Cir. 1985) and *United States v. Kats,* 871 F.2d 105 (9th Cir. 1989). "The gravamen of Medicare Fraud [under the AKS] is inducement ...." *Shaw*, 106 F. Supp. 2d at 121, citing *United States v. Bay State Ambulance and Hospital Rental Serv.,* 874 F.2d 20, 29 (1st Cir. 1989).

202.     One – and maybe the only – purpose of the remuneration paid to Dr. DeFronzo, other KOLs and trusted diabetes organizations by Takeda was to induce them to recommend use of Actos as a treatment method for the condition of prediabetes through scholarly publications and speaking engagements.  Among other things, Dr. DeFronzo overstated the benefits and minimized the risks associated with this medication. Dr. DeFronzo also failed to disclose his monetary relationship with Takeda on at least one important occasion in 2011 when he advocated that Actos be used for an off-label purpose.  Takeda has therefore violated the AKS.

203.     Compliance with the AKS is both a condition of participation and a condition of payment under government healthcare programs and is material to the decisions of state and federal programs to reimburse for prescriptions of Actos.  Through violations of the AKS, Takeda knowingly caused doctors to prescribe and pharmacies to fill prescriptions for Actos that it knew would be submitted for reimbursement to state and federal healthcare programs.  Takeda

has therefore caused the submission of false or fraudulent claims for payment or approval in violation of 42 U.S.C. § 1320a-7b(b)(2).

204. The United States has been damaged.

## COUNT TWO:
## FALSE CLAIMS ACT 31 U.S.C. §§3729(a)(1) and (a)(2)

205. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

206. This is a claim for treble damages and penalties of each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

207. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

208. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

209. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.

210. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices and illegal inducements.

211. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Federal health insurance programs have paid many thousands of claims, amounting to many hundreds of

millions of dollars, for off-label prescriptions for indications that were not approved by the FDA and/or for prescriptions that were illegally induced by Defendants.

## COUNT THREE: CONSPIRACY
### FALSE CLAIMS ACT 31 U.S.C. §3729(a)(1)(G)
### & RELEVANT STATE STATUTES

212.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

213.    This is a claim for treble damages and penalties of each false claim and each false statement under the False Claims Act, 31 U.S.C. §3729, *et seq*., as amended.

214.    Takeda and Lilly conspired with one another to promote off-label uses of Actos in violation of the FCA and to pay kickbacks to physicians in violation of the Anti- Kickback Statute to induce physicians to prescribe high volumes of Actos thereby causing all of the physicians' and pharmacists' and third-party payers' claims to the state Medicaid programs, Medicare and other federal healthcare programs to be false or fraudulent. Accordingly, Takeda and Lilly conspired to defraud the Government by (a) getting false or fraudulent claims allowed or paid, or (b) committing a violation of the FCA, in violation of 31 U.S.C. § 3729(a), or committing violations of relevant State Statutes, including: California Government Code §12651(a)(3); Colorado Revised Statutes § 25.5-4-305; General Statutes of Connecticut § 17b-301b; 6 Del C. §1201(a)(3); Fla. Stat. Ann. §68.082(2); O.C.G.A. § 49-4-168.1; Haw. Rev. Stat. § 661-21(a); 740 Ill. Comp. Stat. §§ 175/3(a)(1), (2); Indiana Code 5-11-5.5 *et seq.*; Iowa Code § 685.2; La. Rev. Stat. Ann. § 46:438.3; Code of Maryland § 2-602; Mass. G.L. c. 12 §§ 5B(3); Michigan Compiled Laws §§ 400.606–607 *et seq.*; Minn Stat. § 15C.02; M.C.A. § 17-8-403; Nev. Rev. Stat. Ann. §357.040(1); New Jersey False Claims Act, N.J. Stat. § 2A:32C-3; N.M. Stat. Ann § 27-14-4; New York State Fin. Law § 189; N.C.G.S § 1-607; 63 Okl. St. § 5053.1; R.I.

Gen. Laws § 9-1.1-3; Tenn. Code Ann. §71-5-182(a); Tex. Hum. Res. Code Ann. §36.002; Va. Code Ann. §8.01-216.3; Revised Code of Washington § 74.66.020; Wis. Stat. § 20.931(2); and, D.C. Stat. §2-381.02.

215.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

216.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

217.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.

218.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices and illegal inducements.

219.    By virtue of the false or fraudulent claims submitted, paid, or approved as a result of Takeda and Lilly's conspiracy to defraud the Government, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.  Federal health insurance programs have paid many thousands of claims, amounting to many hundreds of millions of dollars, for off-label prescriptions for indications that were not approved by the FDA and/or for prescriptions that were illegally induced by Defendants.

## STATE CLAIMS

## COUNT FOUR:
## CALIFORNIA FALSE CLAIMS ACT
### California Government Code §§ 12651(a)(1), (2) and (3)

220.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

221.     This is a *qui tam* action brought by Relator on behalf of himself and the State of California to recover treble damages and civil penalties under the Cal. Gov. Code §12651(c).

222.     As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of Cal. Gov. Code §§ 12651(a)(1), (2) and (3).

223.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

224.     The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FIVE:
## COLORADO MEDICAID FALSE CLAIMS ACT
### Colorado Revised Statutes § 25.5-4-305

225.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

226.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Colorado to recover treble damages and civil penalties under C.R.S. § 25.5-4-306.

227.     As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of C.R.S. § 25.5-4-305.

228.    By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

229.    The State of Colorado is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SIX:
### CONNECTICUT FALSE CLAIMS ACT
### General Statutes of Connecticut § 17b-301b

230.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

231.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301d.

232.    As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Connecticut False Claims Act.

233.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

234.    The State of Connecticut is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SEVEN:
## DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 Del C. §1201(a)(1), (2) and (3)

235.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

236.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Colorado to recover treble damages and civil penalties under 6 Del C. §1203(b).

237.     As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Delaware False Claims and Reporting Act, 6 Del C. §1201(a)(1), (2) and (3).

238.     By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

239.     The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT EIGHT:
## FLORIDA FALSE CLAIMS ACT
### Fla. Stat. Ann. §68.082(2)

240.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

241.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Florida to recover treble damages and civil penalties under Fla. Stat. Ann. §68.083.

242.     As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Florida False Claims Act, Fla. Stat. Ann. §68.082(2).

243. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

244. The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT NINE:**
**GEORGIA FALSE MEDICAID CLAIMS ACT**
**O.C.G.A. § 49-4-168.1**

245. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

246. This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.2(c).

247. As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1.

248. By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

249. The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TEN:**
**HAWAII FALSE CLAIMS ACT**
**Haw. Rev. Stat. § 661-21(a)**

250. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

251.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §661-25.

252.    As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Hawaii False Claims Act, Haw. Rev. Stat. §661-21(a).

253.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

254.    The State of Hawaii is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

<u>**COUNT ELEVEN:**</u>
**ILLINOIS WHISTLEBLOWER AND PROTECTION ACT**
**740 Ill. Comp. Stat. §§ 175/3(a)(1), (2)**

255.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

256.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/4(b).

257.    As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/3(a)(1), (2).

258.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

259. The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWELVE:
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### Indiana Code 5-11-5.5 *et seq.*

260. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

261. This is a *qui tam* action brought by Relator on behalf of himself and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5-4.

262. As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5 *et seq*.

263. By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

264. The State of Indiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTEEN:
## IOWA FALSE CLAIMS ACT
### Iowa Code § 685.2

265. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

266.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Connecticut to recover treble damages and civil penalties under the Iowa Code § 685.3.

267.     As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the Iowa Code, Iowa Code § 685.2.

268.     By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

269.     The State of Iowa is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FOURTEEN:
## LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW
### La. Rev. Stat. Ann. § 46:438.3

270.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

271.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

272.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:438.3.

273.     By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

274.    The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT FIFTEEN:
## MARYLAND FALSE HEALTH CLAIMS ACT
### Code of Maryland § 2-602

275.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

276.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Maryland to recover treble damages and civil penalties under the Code of Maryland § 2-604(a).

277.    As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Maryland False Health Claims Act, Code of Maryland § 2-602.

278.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

279.    The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT SIXTEEN:
## MASSACHUSETTS FALSE CLAIMS LAW
### Mass. G.L. c. 12 §§ 5B(1), (2) and (3)

280.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

281.     This is a *qui tam* action brought by Relator on behalf of himself and the Commonwealth of Massachusetts to recover treble damages and civil penalties under the Mass. G.L. c. 12 § 5C(2).

282.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Massachusetts False Law, Mass. G.L. c. 12 §§ 5B(1), (2) and (3).

283.     By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

284.     The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT SEVENTEEN:**
**MICHIGAN MEDICAID FALSE CLAIM ACT**
**Michigan Compiled Laws §§ 400.606–607 *et seq*.**

285.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

286.     This is a *qui tam* action brought by Relator on behalf of himself and the State of Michigan to recover treble damages and civil penalties under MCL § 400.610a.

287.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Michigan Medicaid False Claim Act, MCL §§ 400.606–607 et seq..

288.     By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

289.    The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT EIGHTEEN:
## MINNESOTA FALSE CLAIMS ACT
### Minn Stat. § 15C.02

290.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

291.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Minnesota to recover treble damages and civil penalties under Minn Stat. § 15C.05.

292.    As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Minnesota False Claims Law, Minn Stat. § 15C.02.

293.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

294.    The State of Minnesota is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT NINETEEN:
## MONTANA FALSE CLAIMS ACT
### M.C.A. § 17-8-403

295.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

296.    This is a *qui tam* action brought by Relator on behalf of himself and the State of Minnesota to recover treble damages and civil penalties under the Montana False Claims Act, M.C.A. § 17-8-406.

297. As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Montana False Claims Law, M.C.A. § 17-8-403.

298. By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

299. The State of Montana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TWENTY:**
**NEVADA FALSE CLAIMS ACT**
**Nev. Rev. Stat. Ann. §357.040(1)**
**(Amended BY 2007 Nevada Laws Ch. 454 (S.B. 529)**

300. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

301. This is a *qui tam* action brought by Relator on behalf of himself and the State of Minnesota to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.090.

302. As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Nevada False Claims Law, Nev. Rev. Stat. Ann. §357.040(1).

303. By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

304. The State of Nevada is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-ONE:
## NEW JERSEY FALSE CLAIMS ACT
### New Jersey False Claims Act, N.J. Stat. § 2A:32C-3

305.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

306.     This is a *qui tam* action brought by Relator on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32C-5.

307.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the New Jersey False Claims Act, N.J. Stat. § 2A:32C-3.

308.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

309.     The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-TWO:
## NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. Ann § 27-14-4

310.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

311.     This is a *qui tam* action brought by Relator on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann §§ 27-14-7.

312.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann § 27-14-4.

313.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

314.     The State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-THREE:
### NEW YORK STATE FALSE CLAIMS ACT
### New York State Fin. Law § 189

315.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

316.     This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under New York State Fin. Law § 190.

317.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the New York State False Claims Act, New York State Fin. Law § 189.

318.     By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

319.     The State of New York is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-FOUR:
## NORTH CAROLINA FALSE CLAIMS ACT
### N.C.G.S § 1-607

320.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

321.    This is a *qui tam* action brought by Relator on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C.G.S § 1-608.

322.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the North Carolina False Claims Act, N.C.G.S § 1-607.

323.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

324.    The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-FIVE:
## OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 Okl. St. § 5053.1

325.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

326.    This is a *qui tam* action brought by Relator on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053.2.

327.    As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053.1.

328.     By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

329.     The State of Oklahoma is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT TWENTY-SIX:**
**RHODE ISLAND STATE FALSE CLAIMS ACT**
**R.I. Gen. Laws § 9-1.1-3**

330.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

331.     This is a *qui tam* action brought by Relator on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-4.

332.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-3.

333.     By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

334.     The State of Rhode Island is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-SEVEN:
## TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. §71-5-182(a)

335.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

336.     This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tenn. Code Ann. §71-5-183(b).

337.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-182(a).

338.     By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

339.     The State of Tennessee is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-EIGHT:
## TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code Ann. §36.002

340.     Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

341.     This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tex. Hum. Res. Code Ann. §36.101-102.

342.     As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.002.

343.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

344.    The State of Texas is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT TWENTY-NINE:
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. §8.01-216.3

345.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

346.    This is a *qui tam* action brought by Relator on behalf of the State of Virginia to recover treble damages and civil penalties under the Va. Code Ann. §8.01-216.5.

347.    As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.3.

348.    By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

349.    The State of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY:
## WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT
### Revised Code of Washington § 74.66.020

350.    Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

351. This is a *qui tam* action brought by Relator on behalf of himself and the State of Washington to recover treble damages and civil penalties under RCW 74.66.050.

352. As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Washington State Medicaid Fraud False Claims Act, Revised Code of Washington § 74.66.020.

353. By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

354. The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT THIRTY-ONE:**
**WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW**
**Wis. Stat. § 20.931(2)**

355. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

356. This is a *qui tam* action brought by Relator on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(5).

357. As alleged here, Defendants' off-label marketing of Actos and kickback activity were performed in violation of the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(2).

358. By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

359. The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT THIRTY-TWO:
## DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. Stat. §2-381.02 (Formerly D.C. Code Ann. §2-308.14)

360. Relator incorporates by reference the allegations set forth in the paragraphs above as if set forth fully herein.

361. This is a *qui tam* action brought by Relator on behalf of himself and the District of Columbia to recover treble damages and civil penalties under D.C. Stat. §2-381.03(b).

362. As alleged here, Defendant's off-label marketing of Actos and kickback activity were performed in violation of the District of Columbia Procurement Reform Amendment Act, D.C. Stat. §2-381.02.

363. By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

364. The District of Columbia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## XI. PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendants as follows:

a. That Defendants be found to have violated 31 U.S.C. §§ 3729 *et seq.*, 42 U.S.C.A. § 1320a-7b, and the equivalent provisions of the state statutes set forth above;

b. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants'

actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the named states sustained because of Defendants' actions, plus a civil penalty for each violation;

d. That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

e. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

f. That Relator recover such other relief as the Court deems just and proper.

Dated: March 20, 2015

RELATOR PETER LAWTON

By his attorneys,


   /s/ *David E. Kovel*          
David E. Kovel (*pro hac vice*)
KIRBY McINERNEY, LLP
825 Third Avenue, 16th Floor
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540
dkovel@kmllp.com

Scott McConchie (BBO #634127)
SHERIN AND LODGEN LLP
101 Federal Street
Boston, MA 02110
Tel: (617) 646-2000
Fax: (617) 646-2222
smcconchie@sherin.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via mail on those indicated as non-registered participants on March 20, 2015.


_____/s/ _David E. Kovel_____
David E. Kovel (*pro hac vice*)